[No. 618.    September 1, 1896.]

# FRANCISCO GONZALES y BORREGO ET AL., PLAINTIFFS IN ERROR, v. TERRITORY OF NEW MEXICO, DEFENDANT IN ERROR.

CRIMINAL LAW—REVIEW OF JUDGMENTS OF DISTRICT COURTS BY WRIT OF ERROR—STAY OF EXECUTION.—The judgments of the district courts of the territory of New Mexico, in criminal cases, are reviewable in the supreme court of the territory by writ of error, which operates as a stay of execution in such cases, though no provision is made for supersedeas, being a supersedeas by implication.

ID.—SPECIAL TERM—CONTINUANCE BEYOND TIME OF REGULAR TERM— VALIDITY.—Proceedings, in a murder case, at a special term of the district court, were not invalid because the term was continued beyond the time fixed for the regular terms of the other counties of the district.

ID.—HOMICIDE—INDICTMENT—PLEADING—SUFFICIENCY.—A charge in an indictment that the deceased "instantly" died of mortal wounds inflicted upon him by the accused, was sufficient to constrain the conclusion that his death was effected on the spot, at the place where it was caused, as the equivalent of "then and there."

ID.—MURDER IN FIRST DEGREE—INDICTMENT—PLEADING—SUFFICIENCY.— An indictment charging that the accused "unlawfully, feloniously, willfully, purposely, and with express malice aforethought did shoot and kill" deceased, embodied in its terms all the elements necessary to constitute murder in the first degree, so distinctly and comprehensively as to exclude murder in any less degree.

ID.—MURDER—ALIBI—ONUS—REASONABLE DOUBT—INSTRUCTION.—An instruction that it was incumbent on defendants to establish, by a preponderance of the evidence, that they were not at the place where the murder was committed or were in some other place, away from the place of the murder, but not beyond a reasonable doubt, and imposing on the prosecution the obligation to demonstrate beyond a reasonable doubt that the defendants were at the place where deceased was killed, and giving defendants the benefit of their testimony to create in the minds of the jury a reasonable doubt as to their being at the place, was not error.

ID.—MURDER—EVIDENCE—ADMISSIBILITY.—On a trial of B., and others, on indictment for the murder of C., where G. testified that he was approached by V. with a proposition to assassinate C., that the details of the proposed assassination were discussed by V. and B. with him,

that they informed him that two of the other defendants were in the agreement, that their object was to remove C. because of his prominence and great strength in his political party, to which they were antagonistic and wished to destroy in the county, that he seemingly acquiesced in their proposition, but, having no reason to murder C., determined, on reflection, to put him on his guard, and accordingly sent him a note (which was found among the papers of C. after his death and identified by the witness), and that afterward to avoid importunity from V. and B. to cooperate with them in the assassination of C., and from fear of them as members of a certain secret society, under apprehension that they would become aware of his betrayal of them, left the territory,—Held:    That his testimony and the note were admissible to prove the conspiracy.

ID.—WITNESS CONVICTED OF MISDEMEANOR—COMPETENCY OF TESTIMONY. Conviction of an offense not greater than a misdemeanor, either by the statute or at common law, will not render a witness incompetent to testify.

ID.—MURDER—ALIBI—CROSS-EXAMINATION OF ACCUSED—JUDICIAL DISCRETION.—In a murder trial, where defendants, claiming an alibi, testified to their whereabouts from 7 o'clock P. M. of the night of the murder, it was within the discretion of the court to permit them to be cross-examined as to their whereabouts from the noon preceding up to that time.    The rule that a witness can not be cross-examined as to any facts irrelevant or collateral to the issue merely to contradict him, does not exclude the contradiction of a witness as to any facts immediately connected with the inquiry.

ID.—MURDER—ADMISSIBILITY OF TESTIMONY—JUDICIAL DISCRETION.—The refusal, on such trial, to permit defendants, who were at a certain place at a certain time prior to the murder, to introduce testimony to show that the persons, who testified that they saw defendants at another place at that time, were not there themselves at that time, was a matter within the sound discretion of the court.

ID.—MURDER—CROSS-EXAMINATION OF DEFENDANTS FOR PURPOSE OF IMPEACHMENT—JUDICIAL DISCRETION.—The right of the court, in such case, to permit defendants to be asked, on cross-examination, as to the killing by them, of another, a few days after the murder in question, for the purpose of discrediting them, was within the limits of a sound judicial discretion.

ID.—AMENDMENT OF RECORD NUNC PRO TUNC—PROOFS REQUIRED.—In such case, an amendment, by the trial court, of the record, by an order nunc pro tunc, to show arraignment and pleas of not guilty, was warranted by the trial judge's recollection of the facts of arraignment and pleas of not guilty, shown by the affidavits of the clerk, the sheriff, district attorney, and court stenographer, if not by a recital in the record alone, that "issue being joined," the trial was had, and a verdict of guilty returned.

ID.—RECORD, CORRECTION OF, AFTER EXPIRATION OF TERM.—The correction, by the trial court, of an omission or false entry in a record, by an order nunc pro tunc, is not limited to the term at which such omission or entry was made, but may be made "whenever the ends of justice may require it." Comp. Laws 1884, sec. 1836.

ID.—AMENDMENT OF RECORD BY ORDER NUNC PRO TUNC—EXTENT OF POWER.—And this power of the trial court to correct the record by an order nunc pro tunc extends to criminal cases.

ID.—POWER OF AMENDMENT. AFTER REMOVAL OF CAUSE BY WRIT OF ERROR.—And the trial court can not be deprived of this power to amend its record so as to make it conform to the truth, by the removal of the cause by writ of error.

ID.—QUALIFICATION OF ASSOCIATE JUSTICE TO SIT OUTSIDE OF HIS DISTRICT —CONSTRUCTION OF STATUTES.—The judicial power vested in the district courts by act of congress of September 9, 1850, to be exercised in each district, "by one of the justices of the supreme court," does not require that it shall be exercised by any particular one of the justices. There is nothing in the language of that clause, nor in the act of congress of June 10, 1858, warranting such a construction as would confine the exercise of the power to the particular justice assigned to the district, when such justice is otherwise disqualified; and the maxim expressio unius exclusio alterius, does not apply.

ERROR, from a judgment of conviction for murder, to the First Judicial District Court, Santa Fe County. Motion to quash writ denied, and judgment affirmed.

The facts are stated in the opinion of the court.

CATRON, SPIESS & GORTNER for plaintiffs in error.

The judgments of the district courts of this territory, in criminal cases, are reviewable in the supreme court of the territory by writ of error. Rev. Stats., U. S., secs. 1868, 1869; Rice v. Rex, Cro. Jac. 404; Rex v. Seton, 7 T. R. 373; Rex v. West Riding, etc., Id. 467; Reg v. Carlisle, 2 B. & Ad. 971; State v. Shepard, 37 Wis. 395; Rex v. Earberry, Fort, 37; 1 Bish. Crim. Proc. [N. Ed.], sec. 1362; Comp. Laws, secs. 2194, 2199; U. S. v. Gibson, 1 Idaho, 364; Comp. Laws, sec. 2484; Barnett v. State, 36 Me. 198, and cita-

tions; U. S. v. Plumer, 1 Cliff, 58; Holford v. Alexander, 12 Ala. 280; Adler v. State, 35 Ark. 517; McKinney v. Western, etc., 4 Iowa, 420; Hawkins v. Bowie, 9 Gill. & J. 428; Fellows v. Griffin, 9 Sm. & M. 362; Calloway v. Nifong, 1 Mo. 223; Reid's Admr. v. Stride's Admr., 7 Gratt. 76; Dows v. Harper, 6 Ohio, 518; Woods v. Caldwell, 34 Pa. St. 92; Comp. Laws 1884, secs. 2468–2473; Id., sec. 2201; Kidder v. Bennett, 2 N. M. 37; State v. Cunningham, 51 Mo. 479.

At common law, a writ of error is not a supersedeas so as to discharge from custody, but in capital cases it operates to stay execution. Whar. Crim. Prac. & Proc. 783. And it is a supersedeas by implication, where judgment is removed by the writ. 9 Bac. Abr. "Supersedeas," p. 284. See, also, Bishop of Ossory's Case, 3 Crooks, 534; State v. Pagels, 92 Mo. 300; Kitchen v. Randolph, 93 U. S. 86.

Defendant in error, having invoked the jurisdiction of this court, can not be heard to object to the consideration of this cause on the present writ of error. 2 Ency. Pld. & Prac. 349.

The court erred in continuing the special term of court and the trial of this cause, after the time for the convening of the court and the adjournment thereof at the end of the three days, as fixed by law. Comp. Laws 1884, sec. 551, et seq. See, also, Downey v. Smith, 13 Ill. 671; Bush v. Doy, 1 Kan. 86; Cooper v. Ins. Co., 3 Colo. 318; Davis v. Fish, 1 Green (Iowa), 409; Grable v. State, 2 Id. 565; Gregg v. Cooke, Peck. (Tenn.) 82; Ex Parte Lilley, 7 S. C. 372; Galushe v. Butterfield, 2 Scam. (Ill.) 227; Goodsal v. Boynton, 1 Id. 555; Mendum v. Comm., 6 Rand. (Va.) 715; Dunn v. State, 2 Ark. 249; In re Millington, 24 Kan. 160; Cox v. State, 30 Id. 202; Smith v. Chichester, 1 Cal. 409; Bates v. Gage, 40 Id. 184; Cain v. Goda, 84 Ind. 209; Batten v. State, 80 Id. 396; Newman v. Ham-

mond, 46 Id. 119; Norwood v. Kenfield, 34 Cal. 331; Earles v. Earles, 27 Kan. 542; Archer v. Ross, 2 Scam. 303.

The indictment failed to charge that deceased died within a year and a day from the assault, or within what jurisdiction he died. Such averments were necessary to distinguish murder from common assault, and to confer jurisdiction on the court. Am. and Eng. Ency. Law, pp. 636, 638; Kerr on Hom., sec. 268; People v. Wall., 9 Cal. 32; People v. Cox, Id. 33; People v. Lloyd, Id. 34; Chapman v. People, 39 Mich. 360; Comm. v. Parker, 2 Pick. 558; State v. Orrell, 1 Dev. (N. C.) 140; State v. Sides, 64 Mo. 385; State v. Lakey, 65 Id. 217; State v. Steeley, Id. 221; State v. Mayfield, 66 Id. 125; State v. Reaky, 1 Mo. App. 3; State v. Sundheimer, 93 Mo. 315; Edmonson v. State, 51 Tex. 497; Comm. v. Macloon, 101 Mass. 1; U. S. v. Ball, 140 U. S. 118; Riggs v. State, 26 Miss. 55; Davidson v. State, 34 Me. 973; State v. Hobbs, 17 S. E. Rep. 38; Whar. on Hom., sec. 791; Whar. Am. Crim. L., sec. 272; State v. Conley, 39 Me. 94; State v. Testerman, 68 Mo. 413; State v. Fley, 2 Brev. (S. C.) 346; 1 Bish. Crim. Proc. [3 Ed.], secs. 407–409; 2 Id., secs. 533, 534; 2 Whar. Pr. 114; 1 Whar. Crim. L. [9 Ed.], sec. 537; State v. Baker, 1 Jones L. 267; State v. Blan, 69 Mo. 317; State v. Shepard, 8 Ire. L. 195; 5 Bac. Abr., pp. 79–81; 1 Russ. on Crimes [2 Am. Ed.] 470; U. S. v. Cruikshank, 92 U. S. 542; U. S. v. Crook, 17 Wall. 174. See, also, U. S. v. Carl, 105 U. S. 611; U. S. v. Hess, 124 Id. 483; U. S. v. Slenker, 32 Fed. Rep. 691; U. S. v. Conant, 9 Cent. Law J. 129.

The court erred in admitting in evidence the declaration and writings of Juan Gallegos. Wright on Crim. Conspir. 217, 218; 3 Greenlf. Ev., sec. 94; State v. Larkin, 49 N. H. 44; Logan v. U. S., 144 U. S. 308. See, also, Whar. Crim. Ev., sec. 698, et seq.; 1

Phil. Ev. 94; 2 Stark, 141; State v. Haney, 2 Dev. & Bat. 390; Kirby v. State, 7 Yerg. 259; Page v. Parker, 40 N. H. 62; Lee v. Lamprey, 43 Id. 15; 2 Best. on Ev. 508; People v. Davis, 56 N. Y. 103; State v. Dean, 13 Ired. 63; Patton v. State, 6 Ohio St. 467, and numerous other authorities.

The court erred in allowing the witnesses for the prosecution, Nowell and Trujillo, who had been convicted of infamous crimes, to testify. Mackin v. U. S., 117 U. S. 352, 353; Spalding v. Saxton, 6 Watts, 338; Cox v. Cox, 26 Pa. St. 376–384; State v. Mullen, 33 La. Ann. 159; Cooper v. State, 7 Tex. App. 195.

The court erred in permitting prosecution, on rebuttal, to introduce evidence tending to contradict immaterial and collateral facts which the territory had itself adduced by its cross-examination. U. S. v. White, 5 Cranch, C. C. 39; Gaines v. Comm., 50 Pa. St. 319; Rey v. Hilditch, 5 Carr & Payne, 298; Rey v. Stimpson, 2 Id. 415; Foye v. Leighton, 22 N. H. 71; Boies v. Henney, 32 Ill. 133; Clifton v. McKensie, 5 Strab. (N. C.) 36; Kohler v. Wells Fargo Co., 26 Cal. 615.

To charge murder in any degree, the words describing the elements of that degree must be employed. State v. Love, 93 Mo. 547; Cannon v. State, 60 Ark. 564; Jones v. State, 58 Id. 390; Denham v. State, 22 Fla. 664; Wiggins v. State, 23 Id. 180; Simmons v. State, 32 Id. 387; Schaffer v. State, 22 Neb. 557; Blantin v. State, 1 Wash. 265; Blake v. State, 121 Ind. 433; State v. Fooks, 29 Kan. 425; Leonard v. Territory, 2 Wash. 381; State v. Brown, 21 Kan. 38; Smith v. State, 1 Id. 365; Bowers v. State, 5 Mo. 364; State v. Jones, 20 Id. 58; Robbins v. State, 8 Ohio St. 131; Id. 90, 306; Hogan v. State, 10 Id. 450; Loefner v. State, Id. 599; Snyder v. State, 59 Ind. 105. See, also, Tenorio v. Territory, 1 N. M. 279.

The jury were improperly instructed that the burden of proof was on defendants to prove the defense of

alibi. Toler v. State, 16 Ohio St. 583; Fife v. Comm.
9 Pa. 429; French v. State, 16 Ind. 670; Pollard v.
State, 15 Miss. 410; Chappel v. State, 7 Colo. 92;
Gibbs v. State, 1 Tex. App. 12; Otmer v. People, 76
Ill. 149; Howard v. State, 50 Ind. 190; Comm. v.
Choate, 105 Mass. 451; State v. Storms, 94 N. C. 973;
State v. Chee Gong, 16 Ore. 534; People v. Chun
Heong, 86 Cal. 309; People v. Nelson, 85 Id. 421;
State v. Shoyer, 104 Mo. 441; Mullens v. People, 110
Ill. 442; State v. Freeman, 100 N. C. 429; People v.
Stone, 117 Ill. 35; Balkinship v. State, 55 Ark. 244;
Walters v. State, 39 Ohio St. 215; Roodey v. Comm.
108 Pa. 500; Davis v. U. S., 160 U. S. 469.

JOHN P. VICTORY, solicitor general, J. H. CRIST,
district attorney, and H. L. WARREN for the territory.

The special term of the district court had jurisdic-
tion of the cause from the commencement of the trial
to its conclusion. Laws 1893, chap. 61, sec. 20, p. 108;
Laws 1891, chap. 90, sec. 3; Comp. Laws, secs. 531, 536,
543, 545, 552, 552a. See, also, Cooley's Const. Lim.
[5 Ed.] 73; Follett v. Hall, 47 Am. Dec. (Ohio) 365;
Hemingway v. Davis, 24 Ohio St. 150; Davis v. Mes-
senger, 17 Id. 231; State v. Knight, 19 Iowa, 96–99;
State v. Calendino, 8 Id. 288; Weaver v. Cooledge, 15
Id. 244; In re Dossett, 37 Pac. Rep. 1066; Server v.
State, 105 Ind. 125; Samuels v. State, 3 Mo. 73; Ser-
vier v. Dille, 17 Id. 69; Railroad v. Hand, 7 Kan. 380;
State v. Knight, 7 N. W. Rep. (Iowa) 16; Dunn v.
State, 2 Ark. 229; Munzesheimer v. Fairbanks, 82
Tex. 351; Murray v. State, 17 S. E. Rep. (Ga.) 99;
Smith v. N. P. Rd., 53 N. W. Rep. 173; Machine Co.
v. McCaffrey, 38 N. E. Rep. 208; Casely v. State, 32
Ind. 62; State v. Montgomery, 8 Kan. 351; Cook v.
Smith, 54 Iowa, 640. See, also, as to waiver, Railroad
v. Power, 119 Mo. 269; Street v. Chapman, 29 Ind.
142; Croy v. State, 32 Id. 384; Murphy v. State, 97

Id. 579; Schlungger v. State, 113 Id. 295; Ard v. State, 114 Id. 542; Mannix v. State, 115 Id. 245.

That part of section 552, Compiled Laws, providing that special terms shall not conflict with regular terms is simply directory, and not mandatory. Mendum v. Comm., 6 Rand. 704; Lewin v. Dille, 17 Mo. 64.

Under an indictment charging murder in the first degree, a verdict finding defendant guilty as charged, is a sufficient finding in the first degree, without specifying the degree, and the jury is not authorized or required to assess the punishment, which under our statute is the duty of the court. Acts 1891, sec. 10, p. 151; Territory v. Romine, 2 N. M. 114; Same v. Yarberry, Id. 391; Kennedy v. People, 39 N. Y. 245; State v. Werse, 53 Iowa, 92; State v. Jennings, 24 Kan. 642; State v. Hooker, 17 Vt. 658; Hogan v. State, 30 Wis. 428. See, also, Whar. Crim. Pl. & Prac. [9 Ed.], sec. 760; People v. Murray, 10 Cal. 309; Davis v. Utah, 151 U. S. 266; Wiggins v. State, 1 S. Rep. 693; State v. Bullock, 13 Ala. 413; Buckley v. State, 2 Greene (Iowa), 162; State v. Walton, 62 Me. 106; People v. Clements, 26 N. Y. 193; Surratt v. State, 45 Miss. 601; Pickett v. State, 22 Ohio St. 405–410; Bish. on Crim. Proc. 325, 612.

While an indictment for murder must allege the time and place of death, this is for the purpose of showing the venue, and that the death occurred within a year and a day; and where these facts appear with sufficient certainty to exclude every other intendment, it will be held good, and always so after verdict. 2 Chitty, Crim. Pl. 737; Arch. Crim. Pl. 34, 381. See, also, Hardin v. State, 4 Tex. App. 355; Turpin v. State, 80 Ind. 148; State v. Huff, 11 Nev. 17.

As to note sent by witness Juan Gallegos to deceased, it was admissible as a part of the res gestae of the facts and circumstances about which the witness

testified. 1 Whar. Law Ev., sec. 259; 1 Greenlf. Ev., sec. 108; 100 Am. Dec. 49, and note, p. 51; Lander v. People, 104 Ill. 248.

The competency of the witnesses Nowell and Trujillo was a question of fact for the court to determine upon the examination of the witnesses on the voir dire. Butchers Co. v. Jones, 1 Esp. 160; Bosham v. Swingler, Id. 164; Rex v. Gisbum, 15 East. 57; Lummis v. Row, 10 Ad. & El. 606; 29 Am. and Eng. Ency. Law, 658. It was disclosed on the examination of both the witnesses on the voir dire that they were pardoned. 1 Greenlf. Ev., sec. 95; Howser v. Comm., 51 Pa. St. 332.

While the rule is a witness can not be contradicted as to any matters drawn out on cross-examination, which are purely collateral and in no way relevant to the issue, this rule does not apply to any facts immediately connected with the main subject of inquiry, with reference to which the witness may be contradicted. 1 Stark. Ev. [9 Ed.] 200, 203; Lawrence v. Lanning, 4 Ind. 194; Ware v. Ware, 8 Me. 42; Comm. v. Hunt, 4 Gray (Mass.) 421; Bank v. Smith, 19 Johns. 123; Chelton v. State, 45 Md. 564.

As to the action of the court in refusing to permit defendants to give testimony in answer to or contradiction of plaintiff's rebuttal testimony to defendant's alibi, the admission of such offers would have opened the door to interminable offers on both sides, and the admission or rejection of such evidence rested in the sound discretion of the court. Marshall v. Davis, 78 N. Y. 414, 420; Hastings v. Palmer, 20 Wend. 225; Rheinhart v. State, 14 Kan. 322; Ford v. Miles, 1 Hill, 300.

The burden of proof is on the accused to establish an alibi by a preponderance of evidence. Thomp. on Trs., sec. 2437; Comm. v. Webster, 5 Cush. 926; State v. Hardin, 46 Iowa, 623, 629; State v. Red, 53 Id. 69;

State v. Reed, 62 Id. 40; State v. Kline, 54 Id. 183; State v. Northrup, 48 Id. 583; State v. Hamilton, 11 N. W. Rep. 5; State v. Jennings, 81 Mo. 185; Garrity v. People, 107 Ill. 162; State v. Johnson, 91 Mo. 439; Ware v. State, 67 Ga. 349; Pellum v. State, 39 Ala. 28; State v. Nance, 25 S. C. 168; Underhill, Ev., sec. 249.

OPINION ON MOTION TO QUASH WRIT OF ERROR.

SMITH, C. J.—This case was brought up to this court from the district court of the county of Santa Fe by writ of error. It is now before us upon motion by the territory through its solicitor general, to quash the writ of error and affirm the judgment of the court below for the alleged reason that appeal is the only process by which criminal cases can be brought up from the district courts to this court for review.

The organic act authorizes the review of the judgment by writ of error. This motion presents the question: Are the judgments of the district courts of the territory of New Mexico, in criminal cases, reviewable in the supreme court by writ of error or appeal? The organic act vests the supreme and district courts with common law and chancery jurisdiction. Sec. 1868, Rev. Stat. U. S.

*Review of judgments of district courts by writ of error in criminal cases: stay of execution.*

And provides that "writs of error, bills of exceptions and appeals shall be allowed in ALL cases, from the final decisions of the district courts to the supreme courts of all the territories, respectively, under such regulations as may be prescribed by law." Sec. 1869, Rev. Stat. U. S.

It is elementary that the mode employed at common law, for the review of common law cases, is by writ of error, and decisions in chancery by appeal. Hence, the territorial courts being vested with common law jurisdiction by the organic act, the decisions of the

district courts are reviewed in the supreme court, in common law cases, by writ of error, and in chancery cases by appeal.

At common law the review of a judgment in a criminal case could be by writ of error and in no other way. Rice v. Rex, Cro. Jac. 404; Rex v. Seton, 7 T. R. 373; Rex v. West Riding, etc., 7 T. R. 467; Reg v. Carlisle, 2 B. & Ad. 971; State v. Shepard, 37 Wis. 395.

Permission from the crown was, however, in criminal cases, always necessary to maintain the writ in England. This permission was granted as of right in misdemeanor, while in treason or felony it was a matter of grace from the sovereign, who could withhold or allow at pleasure, though there was manifest error in the record.

The reason assigned for this was that the felon had forfeited all he had to the crown, and the crown could exercise its pleasure whether or not to give it back. Rex v. Earberry, Fort, 37.

The method of procuring a review when this grace was extended was always by writ of error and in no other way.

In the United States, forfeitures not being one of the penalties visited upon the felon, the writ is awarded by the courts as of course wherever it would have been granted in England by fiat of the crown. Sec. 1362, 1 Bishop, New Crim. Proc.

Congress, in preserving to litigants the right of review by writ of error undoubtedly must have had in mind the writ of error as the same was employed by common law, because it conferred common law jurisdiction upon the court wherein it was to be made use of, and left it to our legislature to regulate the manner of taking and allowing the same.

This, our legislature has done by the enactment of section 2194, Compiled Laws, which provides: "The clerk of the supreme court shall issue a writ of error

to bring into the supreme court any cause finally adjudged or determined in any of the district courts, upon a praecipe therefor   *   *   *   at any time within one year from the date of such judgment   *   *   *"

And section 2199: "Hereafter no writ of error shall be allowed by the supreme court of this territory, except within one year after the rendition of the judgment on which said writ of error is based; and that said supreme court shall make rules for the government of the practice in writs of error in common law cases, which said rules shall not conflict with any of the laws in force in this territory."

The terms "writs of error" and "appeals," as they appear in the organic act, have a technical significance well known to the law. It is then provided that they "shall be allowed in all cases" and are guaranteed parties in all cases.

Something having definiteness and substance is secured to the court and to the parties before it by this language; and it is put beyond the power of the territorial legislature to deny, alter, or curtail. The jurisdiction is fixed by the organic act, the power to regulate the procedure is reposed in the legislature. It can not be contended that congress has, in one and the same form of expression, secured to the supreme court a certain jurisdiction and to parties certain rights, and given to the territorial legislature the power to make that jurisdiction nugatory and these rights unavailing.

This provision, with its imperative phraseology, intends nothing short of assuring to the appellant, not whatever the territorial legislature may be pleased to call an appeal, but an appeal known to chancery, and assuring to the plaintiff in error the writ of error with all the benefits growing out of, and incident to, such writ.

What congress had given, it has not authorized the territorial legislature to take away by regulations.

The allowance of the writ of error may be regulated by the legislature, as has been done; but these regulations must not derogate from the nature and substance of the thing given it to regulate. Whatever the territorial legislation on this subject is, or may have intended, it can not have taken from the supreme court jurisdiction to review cases cognizable at common law by writ of error.

The power given by the organic act to the legislature to regulate writs of error and appeals is not operative to enable the legislature to limit or to regulate what is fixed and assured by the same organic act.

The power to regulate does not confer power to abrogate. Our legislature has not, however, made any attempt to interfere with or deny the jurisdiction conferred upon the supreme court by the organic act, but on the contrary has regulated such jurisdiction by sections 2193 and 2194, Compiled Laws. In providing for appeals from final judgments in criminal cases, it has merely given a concurrent remedy.

In United States v. Horace C. Gibson, 1 Idaho, 364, the court reached the conclusion that a common law action could not be re-examined on appeal, but must be brought up by writ of error, in the following opinion:

"The courts of this territory are created by the organic act, and their jurisdiction and powers must be ascertained by the provisions of said act and the laws of the territory passed in pursuance thereof. Both the district and supreme courts are by the express terms of the act clothed with chancery and common law jurisdiction; and the legislature has no authority to abridge such jurisdiction, nor has the legislative assembly made any attempt so to do  *  *  *.  How shall this appellate jurisdiction be exercised? The organic act, in very plain and positive language, declares that writs of error, bills of exceptions and appeals shall be allowed

in all cases from the final decisions of the district courts to the supreme court, under such regulations as may be prescribed by law. Congress, therefore, has not delegated the power to the legislature to say in what cases writs of error and appeals may be allowed, but has emphatically declared in language that is plain, that they shall be allowed in all cases. The act, however, does not prescribe the mode in which they shall be allowed, but expressly provides that they shall be allowed under such regulations as may be prescribed by law, thus giving to the legislature the power to prescribe the regulations as to the manner in which they may be taken and allowed."

"The declaration of the act is that writs of error, bills of exception, and appeals shall be allowed. These words have a technical and well understood meaning. 'Writs of error' are known to common law proceedings, but an appeal is not; but writs of error and appeals are the modes pointed out by congress whereby common law, equity, and admiralty causes may be reviewed and re-examined in the supreme court; and when congress used these words in the organic act, it must be considered that they used them in accordance with the sense that had been given them by the supreme court of the United States. There is no doubt but that they were so used and intended to be understood, in the same section, in providing for the writs of error and appeals from this court to the supreme court of the United States."

"If this be the sense in which these words were used, it follows that the true interpretation of that clause of the organic act is this—that writs of error and bills of exceptions shall, in suits at common law, be allowed and taken, and appeals in equity and admiralty cases shall be allowed from the district to the supreme court; and that the power is conferred upon the legislature to regulate the manner and prescribe the rules of practice in taking and allowing them."

II.   Remedy by writ of error is concurrent with remedy by appeal.

In criminal cases the common law, as recognized by the United States and the several states of the union, shall be the rule of practice and decision.   Sec. 2484, Comp. Laws.

Under the common law, as we have already seen, the writ of error was the method by which a judgment in a criminal cause could be reviewed.

By providing that the common law, as recognized by the United States and the several states of the union, should be the rule of practice and decision in the territory, the legislature has vested the supreme court with jurisdiction to review judgments in criminal cases by writ of error.

In Barrett v. State, 36 Me. 198, the court say: "Although the remedy by appeal in civil cases takes away the remedy by writ of error, by implication, as a general rule, yet in criminal cases the reason for the rule ceases, and there it does not apply   *   *   *.   His remedy for appeal would often be more onerous than that by writ of error to reverse an erroneous judgment, and, therefore, it is that his right to proceed by error is not taken away or impaired by giving him the right of appeal."   Citing Cook, Pet., 15 Pick. 239; Thayer v. Com., 12 Metc. 9; Co. Lit., 288; 3 Blacks. Com. 407.

In United States v. Plumer, 3 Clifford, 1, at page 58, Judge CLIFFORD said:

"At common law the writ of error would lie in criminal as well as in civil cases, and that the rule was just as applicable to misdemeanors as the case at bar (murder), which was declared by act of congress to be a felony."

In Sanders v. State, 85 Ind. 318, at page 257, the court say:

"It is held in well considered cases that although there is a statute governing proceedings in criminal

cases, the writ is not abolished unless the statute specially or by implication abrogates it. This is so held, with respect to writs coram nobis, by MARSHALL, C. J., in Strode v. Stafford, 1 Brock., U. S. C. 162. In speaking of the claim that the writ coram nobis can not exist under the statute, COWEN, J., said in Smith v. Kingsley, 19 Wend. 620: 'There is no statute expressly and in terms repealing its power, nor any which does by necessary implication. Mere silence or omission to regulate proceedings upon such a writ will not operate as a repeal. The power, therefore, remains as at common law, except as to the mere form coram nobis resident, because the fiction of the record, remaining before the King himself, is gone. We, therefore, have lost the name of the writ, but nothing more.' "

In many of the states the common law writ of error is recognized as forming part of the law. Holford v. Alexander, 12 Ala. 280; Adler v. State, 25 Ark. 517; McKinney v. Western, etc., 4 Iowa, 420; Hawkins v. Bowie, 9 Gill. & J. 428; Fellows v. Griffin, 9 Sm. & M. 362; Calloway v. Nifong, 1 Mo. 223; Reid's Adm'r v. Strides, Adm'r, 7 Grat. 76; Dows v. Harner, 6 Ohio, 518; Wood's Exec. v. Caldwell, 34 Penn. St. 92.

III. Our statute amply provides for a review of the judgment by writ of error.

Kearney's code, promulgated by General Kearney in 1846, and which was by the legislature of 1850 adopted, contains the only provision for appeals from final judgments in criminal cases. These provisions were incorporated into the compiled laws of 1884, as sections 2468, 2469, 2470, 2471, 2472 and 2473.

By section 2469 appeals are allowed from final judgments rendered upon any indictment, to the supreme court, if applied for during the term at which the judgment was rendered. Appeals only lie from such final judgments if allowed during the term at which the judgment was rendered. After the term has expired no appeal can be taken.

In 1880 the legislature passed a comprehensive act, regulating the mode of taking appeals and suing out writ of error.   This act is compiled in sections 2193 and 2194 of the Compiled Laws of 1884, and is in conformity with the organic act which gives the legislature power to regulate the writ of error and appeal,   By that act it was provided that ALL CAUSES either in law or equity, finally adjudged or determined in the district court, may be removed into the supreme court of the territory for review either by appeal or writ of error.   Sec. 2193, Comp. Laws 1884.   The next section, 2194, regulates the practice on appeal and writ of error, and provides that the writ of error may be sued out within one year from the date of the judgment brought into the supreme court.   How could the language of section 2193 be made plainer for the purpose of providing for the review of judgments in criminal cases by writ of error? ALL CAUSES, either in law or in equity, may be removed into the supreme court for review, either by appeal or writ of error.   Criminal cases or causes at law as distinguished from causes in equity and as all causes at law may be removed into the supreme court by writ of error, it follows that criminal cases can be so reviewed.

The legislature of 1884 recognized the fact that judgments in criminal cases could be reviewed either by appeal or writ of error, under the laws as they then existed in the territory, and enacted what is compiled as section 2201 of the Compiled Laws of 1884, viz.: —

"Appellants or plaintiffs in error in criminal cases, removed into the supreme court of the territory for review, shall not be required to print the record, nor any part thereof," etc.   See Kidder v. Bennet, 2 N. M. 37.

In Missouri, 2 Wagner's Stats., section 13, there is a provision "that the state in any criminal prosecution shall be allowed an appeal only in the cases and under the circumstances mentioned in the next succeed-

ing sections." Notwithstanding this provision, it was held in State v. Cunningham, 51 Mo. 479, that "when a motion to quash an indictment is sustained in the lower court, the state can bring the case to this court by writ of error or appeal."

The solicitor general in his brief, at page 8, seems to argue that section 2193 of the Compiled Laws does not apply to criminal cases, because no provision for supersedeas or stay of execution is therein contained. This contention is wholly without merit. At common law, a writ of error is not a supersedeas so as to discharge from custody, but in capital cases it operates to stay execution. Sec. 783, Wharton's Crim. Prac. & Pro.

A writ of error is a supersedeas by implication. If the record of the judgment is removed by writ of error, it is necessarily a supersedeas for the record being removed it is impossible for the justices of the court in which it was to award execution. 9 Brac. Abr. Supersedeas, p. 284.

In the Bishop of Ossory's case, 3 Crooke, 534, it was held that "a writ of error is a supersedeas, although the record itself is not removed to the court where errors are brought, but a transcript only."

The right of appeal in a capital case is necessarily coincident with that of a stay of execution, until that appeal can be heard. State v. Pagels, 92 Mo. 300.

In Kitchen v. Randolph, 93 U. S. 86, the court say: "At common law, a writ of error was supersedeas by implication."

Under the statutes and the authorities it is plain that the judgment in this cause may be reviewed by writ of error.

The motion to quash the writ of error is therefore overruled.

COLLIER and BANTZ, JJ., concur.

OPINION ON THE MERITS.

SMITH, C. J.—At the June term, A. D. 1894, of the district court for the county of Santa Fe, Francisco Gonzales y Borrego, Antonio Gonzales y Borrego, Lauriano Alarid, and Patricio Valencia were indicted for shooting and killing one Francisco Chavez, on the twenty-ninth day of May, 1892, in the county of Santa Fe, and territory of New Mexico. On March 18, 1895, a special term of the said district court was duly called by the Honorable N. B. Laughlin, associate justice of the supreme court, and judge of the First judicial district of New Mexico. Judge Laughlin, deeming himself disqualified to preside at the trial of the said defendants, called in to sit for him Hon. H. B. Hamilton, associate justice of the supreme court, and judge of the Fifth judicial district of the territory of New Mexico, and thereupon Judge Hamilton, during the said special term, commenced the trial of the said parties, to wit, on the twenty-third of April, 1895, and continued the same until the twenty-ninth day of May of the same year, when the jury returned a verdict finding the accused guilty as charged in the indictment. A motion was thereupon made for a new trial and an arrest of judgment, which said motions were duly argued, and, after full consideration, were overruled, and the defendants were thereupon sentenced by the court to be executed on the tenth day of July, 1895. An appeal was thereupon taken by the accused to this court by writ of error from the district court, and the case is now before us for review and determination upon numerous points of error alleged to have been committed during the progress of the trial.

In the first place, it is contended that the special term of the court at which the appellants in error were tried expired by operation of law on the sixteenth day of April, 1895, and could not legally have been prolonged by the

*SPECIAL term: continuance beyond time of regular term: validity.*

action of the presiding judge. It appears that a regular term for a district court in the county of San Juan was fixed by territorial statute to commence on the third Monday of April, 1895, and it is insisted that a limitation was thus imposed upon the duration of the special term commenced in Santa Fe on March 18, 1895; that the terms of court for one county can not encroach by extension upon the courts of other counties of the district; that in theory of law a term of court begins on the day designated by statute for its commencement, and ex vi termini other courts in the district at the same time are prohibited. Such construction might obtain in this territory if statutes did not exclude it. Section 543 of the Compiled Laws directs courts to be held in the different counties at the times fixed by law, and authorizes their continuance until adjourned by order of court. It is manifest that it was intended by this provision to impose a duty and to confer a discretion, and it would seem that, if the exercise of the one should render impracticable the discharge of the other, the discretion should prevail. The interest of the public is the consideration that has induced many courts to the adoption of the doctrine that a term in progress in one county must be arrested by the arrival of the time fixed for a court in another county in the same district, and a judge animated by due regard for public weal, and in his opinion legally possessing absolute power as to the duration of the terms of his courts, might in sound judgment continue one and abandon another. The special term in question commenced March 18, 1895, and it can easily be conceived by this tribunal that the trial judge, in the exercise of his discretion, wisely regarded it more judicious to conclude the case, that had consumed weeks, at the cost of thousands of dollars, than to abandon it for a term in a county of limited population and proportionate litigation. Absence of provision for such an

emergent contingency would be a grave casus omis-
sus.

It is further urged that, as the statute (Comp.
Laws, sec. 552) provides that special terms shall not
conflict with regular terms, the special term at Santa
Fe was necessarily terminated by the regular term con-
structively existing in San Juan on the third Monday of
April, 1895. But said section merely declares against
a conflict, and does not declare the cessation or illegal-
ity of the proceedings of the seemingly conflicting spe-
cial term, and it can not, in any view, be legitimately
maintained that the legislature by such direction in-
tended a mandate, and the vitiation of all proceedings
in disregard of it. By section 543, special terms are,
as to their length, as absolutely in the control of the
presiding judge as are regular terms; and section 552
authorizes special terms, not only in the discretion
of the judge in the furtherance of justice, but without
any condition or restriction as to duration. It may,
therefore, be logically concluded that the authority to
continue terms until adjourned by order of court was
deliberately designed in the interest of the public to
prolong the regular term, if needed, and to afford
special terms without limitation in lieu of regular terms
lapsed, and in furtherance of justice. It must also be
presumed rationally that the legislature, in attaching
by section 552, a condition to the authority to hold
special terms, contemplated an actual, and not a con-
structive, conflict, and did not design that a term being
held should be annulled by one that could not be held.
Section 2, chapter 61, of the statutes of 1893, required
the respective counties to provide for the expenses of
their district courts, and practically inhibits terms in
counties in which there are no funds. It is experience
that a frequent consequence of this system has been the
impossibility to hold courts in some of the counties at
the time fixed by statute, and, as it is a rule of law that

public officers are presumed to perform their official duties, and no court was held in San Juan on the third of April, 1895, it can be legitimately concluded that there were no funds for a term there, and that the judge of the district, with knowledge of this deficiency, appointed a special term in Santa Fe, with the intention and expectation that it would be continued as long as required in the furtherance of justice. It is not conceivable that a court allowed by law and in session could be terminated by a term not only not in esse, but that could not exist; the one was a court in fact, the other a court by construction only, and between them there could not be a practical conflict. It seems, therefore, that the territorial statute sustained the judge in convening the special term, and in continuing it beyond the times fixed for the regular terms for the counties of San Juan, Rio Arriba, and Taos for the spring of the year 1895.

Next is the impeachment of the indictment as not containing the essential averments to confer jurisdiction upon the trial court. It is contended that the allegation that Francisco Chavez instantly died of the mortal wounds inflicted upon him by the plaintiffs in error does not with sufficient distinctness specify the time and place of his death to charge that he died in the county of Santa Fe within a year and a day from the date of the killing. It is difficult to conceive that an instant consequence of an act does not exclude conception of delay in its occurrence, and does not constrain the conclusion that it was effected on the spot, at the place where it was caused. If a deed produces results the moment it is done, they must happen where it was done. Fire applied to powder produces instantaneous explosion, and no doubt of the time and place of the event is possible. There being no intervention of time between the cause and the effect, there can be no question as

HOMICIDE: in-
  dictment: plead-
  ing: sufficiency.

to the place where the latter ensued from the former.

That the accused were apprised that they were on trial for the murder of Francisco Chavez on the night of the twenty-ninth of May, 1892, in the county of Santa Fe; that it was proved that Francisco Chavez was killed then and there; that the accused admitted that they were then in the county of Santa Fe; that they defended themselves against the charge of having murdered Francisco Chavez on the night of the twenty-ninth of May, 1892, by their alibi, claiming that they were not at the place of the killing on said twenty-ninth of May, 1892; and that their acquittal would have protected them against a second prosecution for the same crime. (See Comp. Laws, section 675),—are facts that can not be controverted, and effectually dispose of the pretension that the phraseology of the instrument upon which they were arraigned and tried was not sufficiently specific to indicate the venue of the alleged offense. Many authorities have been submitted to sustain the contention that venue and time are not legally laid by the averment of instant death; that it does not exclude the possibility of the death a year and a day out of the jurisdiction, where and after the wounds were given, but, with due respect for the tribunals that have so adjudicated, we can but regard their conclusions as tending to contract the natural import of language, and strain it from its substantial signification. While courts could abstain from the encouragement of departure from the phraseology of forms almost sacred from protracted adherence to them, they should not pursue such conservatism to the excess of servility. Synonyms should be duly regarded, and words so interpreted that their natural meaning should not be destroyed. Innovations may be unwise, but the antagonism to them that will preclude the use of equivalent expressions would be even more pernicious. In recognition of these principles, less narrowness is obtaining

in the construction of pleadings, and, while certainty
in their allegations is required, strict conformity to
wonted verbiage is not exacted.  "Instantly," say lex-
icographers,—those who define it etymologically, and
those who give its legal meaning,—implies "without
any intervention of time," "allows not a particle of
delay," "marks an interval too small to be appre-
ciated;" and that Francisco Chavez, in dying "with an
interval too small to be appreciated" between the shots
he received and his death, died at the place where he
was shot, seems an irresistible conclusion.  That an
event that transpires instantly can be remote from
its cause seems a contradiction not entitled to any con-
sideration.  That there can be, between an occurrence
and its creation, no intervention of time, not a particle
of delay, not an appreciable interval, and yet be doubt
about the place of its accomplishment, seems an impos-
sible conjecture.  An injunction to do instantly is par-
tially obeyed by the act to forthwith proceed to do it,
though it may never be done; but, if accomplished
without intervention of time, without a particle of de-
lay, the interval between the order and its execution
being not appreciable, it is done instantly.

In Hardin v. State, 4 Texas App. 371, the indict-
ment which charged that "Charles Webb, of mortal
wounds so given as aforesaid, instantly did die," was
pronounced sufficiently certain of the time and place of
his death.  The court regarded the words "so given"
as suggestive, and we may with equal propriety attach
consequence to the description, "said mortal wounds,"
contained in the indictment under consideration, as
they can refer only to wounds recited as having been
inflicted upon Francisco Chavez on the night of the
twenty-ninth of May, 1892, and of which he "instantly
died."

In Turpin v. State, 80 Ind. 148, an indictment that
contains in the allegation as to death neither the words

"instantly" nor "then and there," is sustained, as the venue and time were once stated. This opinion is based upon statute, but the court declared that the equivalent of "then and there" would, in any contingency, be sufficient.

In State v. Huff, 11 Nev. 21, the court, in considering the objection that the indictment did not contain sufficient certainty as to the place of the crime and the day of its commission, say: "It may be said, with reference to this particular case,—and it will be a sufficient answer to appellant's objection, if there were none other,—that the indictment does show, by fair and reasonable intendment, that O'Reilly was stabbed and died on the same day. It says the defendant stabbed him on that day, and killed him on that day. Therefore he must have died on that day. The evidence, we believe, shows that he did not die until the next day, but this was an unimportant variance, and the question is as to the sufficiency of the indictment, not as to the conformity of the proof." It was further decided in this case that failure to demur to the indictment for the defect that it did not declare that the death occurred within a year and a day from the perpetration of the act which produced it was a waiver by the defendant.

In Comm. v. Bugbee, 4 Gray, 206, in an indictment for an assault, the allegation that the assault was then and there made was sufficient without the repetition of "then and there" before the charge, "did actually strike." "There might have been, with the words 'then and there,'" said Chief Justice EWING, in a similar case, "greater deference to tautology, but not thereby a more explicit or intelligible averment." Says METCALF, J.: "Objections like that now before us were never held valid in prosecutions for misdemeanor, but only in favorem vitae in indictments and appeals of death." 3 Hale, P. C. 178; 2 Hawk. P. C., chap. 23,

sec. 28; 7 Dane, Abr. 272. "Even in capital cases," continues Judge METCALF, "they have been deemed by the most eminent English judges as among 'the unseemly niceties' by which the law is blemished and reproached." 2 Hale, P. C. 193; 2 Gabb, Cr. Law, 198, 199. "And this court," further declares Judge METCALF, "in the case of Comm. v. Barker, 12 Cush. 186, 187, decided that an indictment for murder was sufficient which alleged that the defendant, at Worcester, in the county of Worcester, on the second of January, 1853, with a certain axe, feloniously did strike M. B., giving unto the said M. B., then and there, with the axe aforesaid, feloniously, willfully, and with malice aforethought, one mortal wound;" that the words "then and there" needed not to be repeated before the allegation of the mortal wounds, because, notwithstanding the English decision to the contrary, it was deemed most clear that no one upon reading the indictment could fail to understand that the mortal wound was alleged to have been given on the day named in the indictment in Worcester. Says the judge further: "We are of the opinion that a charge expressed in a plain, intelligent, and explicit manner, and in the accustomed legal phraseology, is sufficient to warrant a judgment against the party thus charged, whether that charge be a capital offense or a misdemeanor." See, also, Comm. v. Doherty, 10 Cush. 52.

In Ball v. U. S., 140 U. S. 136, 11 Sup. Ct. 767, it is declared that "all the essential ingredients of the offense charged must be stated in the indictment, embracing with reasonable certainty the particulars of time and place, that the accused may be enabled to prepare his defense, and avail himself of his acquittal or conviction against further prosecution for the same case." The indictment in this case was sustained as to time, though it contained no averments upon that point, upon the ground that it was observed from the

indictment that it was returned before the lapse of a year and a day from the time it was alleged in the indictment the party was assaulted; but no place of death was averred, and there were no data to supply the omission, and the indictment was accordingly remanded, with directions that it should be quashed.

Satisfied that the time and place are stated with sufficient particularity and exactness in the indictment

MURDER in first degree: indictment: pleading: sufficiency.

under consideration "to advise the appellants in error of the nature and cause of the accusation against them" (to use the words of section 673, Comp. Laws), and for which they were arraigned and tried, we will consider the degree of the crime specified. The indictment alleges that the accused unlawfully, feloniously, willfully, purposely, and with express malice aforethought did shoot and kill Francisco Chavez, and it is urged that such charge neither expressly nor by implication is an accusation of murder. The killing is admitted, but that the allegation of the crime charged is of greater degree than assault is gravely denied. The indictment charges that Francisco Chavez was killed as above recited, but the accused claim this is not an accusation that he was murdered. That he died instantly is the statement of the indictment, and yet the pretension is that the accused were arraigned, not for the crime of killing him, but for making an assault upon him. We do not appreciate any such representation, as the indictment, in our conception, embodies in its terms all the elments that constitute murder, and is so distinct and comprehensive that it excludes lesser crime than the most flagrant,—that of murder in the first degree. Murder is defined by our statute as the unlawful killing of a human being with malice aforethought, express or implied; and express malice is described as "the deliberate intention unlawfully to take away the life of a fellow creature which is manifested by external circumstances

capable of proof." Murder in the first degree is classified by statute, and in the enumeration is included a killing perpetrated from a deliberate and premeditated design unlawfully and maliciously to effect the death of any human being. The offense for which the accused were tried is that they unlawfully, feloniously, willfully, purposely, and with express malice aforethought did kill and murder Francisco Chavez, and yet it is insisted that there is the omission of the elements of deliberation and premeditation in this accusation, essential to constitute a charge of murder in the first degree. We might attribute to willfulness that malicious intent, to purpose that positive design, that would involve a contemplation without mature consideration; but we will not resort to construction when the statute is so emphatic as to render it superfluous. Express malice is defined to be "that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof." Let us then substitute for the adverbs employed in the indictment their equivalents according to the lexicographers of legal phraseology, and for the words "express malice aforethought" the definition as given by our statute. "Willfully," in its most moderate signification, is "intentionally;" "purposely" is "designedly;" and "express malice" is, by the statute, "the deliberate intention to take away the life of a fellow creature;" and if for these adverbs there were inserted in the indictment their synonyms and the statutory definition for the phrase "express malice," the charge would then run that the accused unlawfully, feloniously, intentionally, and designedly shot Francisco Chavez with a deliberate intention to take away his life. If such legitimate paraphrasing does not demonstrate that the charge made in the indictment is that of murder in the first degree, it would be difficult to use phraseology to constitute such an accusation.

A deliberate intention unlawfully, feloniously, willfully, purposely to take away life includes all the elements of the crime of murder in the first degree, and by its terms excludes all conception of lesser crime as their signification. There can not be the absence of design to effect death, nor the heat of passion in the perpetration of the crime, where deliberate intention exists; and we can, therefore, but conclude that the indictment exclusively charges murder in the first degree, and no lower crime. It follows, therefore, that the verdict of the jury that the accused are "guilty as charged in the indictment" is responsive to the indictment, and is a finding that they, in killing Francisco Chavez, committed murder in the first degree.

In People v. Enoch, 13 Wend. 159, it was charged that the defendant feloniously and of malice aforethought killed his wife, the words "with premeditated design" being left out, and a general verdict of guilty was returned, and judgment upon the same for the execution of the accused was sustained.

We will now address ourselves to the defense presented by the accused. They deny that they were guilty of the killing of Francisco Chavez, and under-

MURDER: alibi: onus: reasonable doubt: instruction.

took to prove that three were at the house of Seferino Alarid, and the fourth at his home, at the time of the shooting; and the court instructed the jury that it was incumbent upon them to establish this claim by a preponderance of the evidence, but not beyond a reasonable doubt, and added: "If, therefore, after consideration of all the evidence in the case, as well that in relation to the alibi offered by the defendants as that offered by the territory, you have a reasonable doubt as to whether the defendants were at the place where the crime was committed, or were in some other locality, away from the place of the homicide, you should give the defendants the benefit of that doubt, and find them not

guilty." This instruction is objected to as erroneous, in that it announces that the obligation to establish the alibi is upon the defendants. Many respectable authorities have regarded alibi as an affirmative defense, but we do not feel called upon to pass upon this view in this case, as the instruction given by the court distinctly announced to the jury that if they entertained any reasonable doubt, after considering all the evidence of the defendants in relation to the alibi, offered by them, whether they were at the place of the homicide, they should give the benefit of that doubt to the defendants, and find them not guilty. This imposes upon the prosecution the obligation to demonstrate beyond a reasonable doubt that the accused were at the place where Francisco Chavez was killed, and gives them the benefit of their testimony to create in the minds of the jury a reasonable doubt as to their presence then and there. The accused are relieved by this instruction from any responsibility to establish by a preponderance of evidence that they were at the house of Seferino Alarid, or elsewhere, at the time of the perpetration of the crime, as the direction to acquit them if any reasonable doubt had been established by their evidence, or all the evidence in the case, as to their whereabouts at the time of the killing, is peremptory. Leonardo v. Territory, 1 N. M. 291.

We will now consider the objection to the court's action in the admission and rejection of testimony.

One Juan Gallegos, by his own admission an accomplice in the conspiracy to take the life of Francisco Chavez, represented that he was approached by one

MURDER: evidence: admissibility.

Hipolito Vigil with a proposition to assassinate the said Chavez; that the details of the projected crime were discussed between him, the said Vigil, and one of the accused, Francisco Gonzales y Borrego; that they informed him that Antonio Gonzales y Borrego and Partricio Valen-

cia, two of the defendants, were in the agreement; that
their object was to remove Francisco Chavez because
he was a prominent man, of great strength with his
party, to which they were antagonistic, and which they
wished to destroy in the county of Santa Fe.    He,
seemingly to them, acquiesced in their proposition,
but, upon reflection, having no reason to murder said
Chavez, he determined to put him upon his guard, and
accordingly sent him a short note on January 16, 1891
(which said note it was proved was found among the
papers of Francisco Chavez after his death, and was
identified by the said Juan Gallegos on the stand); that
afterward, to avoid importunity from his accomplices,
to cooperate with them in the assassination of Fran-
cisco Chavez, and from fear of them as members of the
"Button Society," under apprehension that they would
become cognizant of his betrayal of them, he went to
Colorado, where he was residing when he heard of the
death of Chavez.    The elements of truth in this state-
ment are manifest.    One of the counsel of the accused
stated the existence of the secret "Button Society" for
political purposes, and declared himself a member of
it; and that Francisco Chavez was assassinated by the
parties who petitioned the witness to unite with them
in the perpetration has been declared by the jury's
verdict and the court's judgment.    It can not be seri-
ously contended that the declarations of the accused
were not properly admitted against them, whether
Francisco Chavez was killed in pursuance of the con-
spiracy revealed by the witness or not.    The note was
no less a declaration of Juan Gallegos than the oral
statements, and the supreme court of Illinois in Lan-
der v. People, 104 Ill. 248, has declared "that acts and
declarations so intimately connected with the principal
event which they characterize as to be a part of the
transaction itself, and which clearly negative any pre-
meditation or purpose to manufacture testimony are

admissible." But there seems no reason to deny a continued conspiracy between this clan, and, in such event, the declarations of one of them in connection with its object or its purpose will be recognized as the declaration of all. "A conspiracy is not destroyed by connection at a subsequent time of new parties therewith, as a new party, agreeing to the plans of the conspirators, and coming in and assisting them, becomes one of them." Wright, Cr. Consp. [Carson's Ed.] 129, citing U. S. v. Nunnemacher, 7 Biss. 111, Fed. Cas. No. 15902; People v. Mather, 4 Wend. 229. The note was the act of one of the conspirators during the existence of the conspiracy. It was a declaration of the existence of the conspiracy by one of the coconspirators, and was properly submitted to the jury in connection with all the evidence on the subject. Judge Morrow, in U. S. v. Cassidy, 67 Fed. Rep. 703, announces that: "Any declaration made by one of the parties during the pendency of the illegal enterprise is not only evidence against himself, but is evidence against the other parties. This rule, you will understand, applies to the declaration of a coconspirator, although he may not be under prosecution, his declarations being equally admissible with those of one under indictment and prosecution." Bish. New Cr. Proc., sec. 1248, cl. 2, says that: "On its being shown that one or more persons were acting in concert with the defendant about the thing in question, all with a common object, declarations during its progress by any one or the other, whether present or absent, may be given in evidence against the defendant." It was in the sound discretion of the judge of the trial court to admit this note as an accompanying act in connection with the combination shown, and the exercise of his authority is not reversible on appeal. Wiborg v. U. S., 163 U. S. 632, 16 Sup. Ct. 1127. Says the supreme court of the United States: "That much discretion is left to the trial court

in the admission of such evidence, and its ruling will be sustained if the testimony which is admitted tends even remotely to establish the ultimate fact." Clune v. U. S., 159 U. S. 590, 16 Sup. Ct. 126.

We do not deem it necessary to consider seriously the objection to the competency of Ike Nowell and Porfirio Trujillo as witnesses. The former was convicted of a crime expressly designated as a misdemeanor by the United States statutes, and subjected to punishment in the penitentiary. Hard labor was not authorized by the statute, and, unless such penalty be attached to the commission of a crime under the federal laws, it is not an infamous offense. Again, adultery is not an infamous offense in this territory, as there is no statute so characterizing it, and its degree is here as at common law, under which it was only a misdemeanor. Porfirio Trujillo was restored to the privileges of citizenship by competent authority, according to his own sworn declaration, and the official records of the executive department sustained him. Having lost one of the pardons, and not having the other with him, it was altogether legitimate to show by the territorial archives that they had been issued to him.

WITNESS convicted of misdemeanor: competency of testimony.

Another contention is that the court erred in permitting the inquiry of the defendants as to whether they were on the streets of the city of Santa Fe, west of the Cathedral, between noon and 7 o'clock of the twenty-ninth day of May, 1892, as it is claimed that their presence during that interval was not material. The defendants replied that they were not west of the Cathedral in the city of Santa Fe at any time of the afternoon of the twenty-ninth day of May, 1892. It is a well-settled rule that a witness can not be cross-examined as to any facts which are irrelevant or collateral to the issue

MURDER: alibi: cross-examination of accused: judicial discretion.

merely to contradict him, but Starkie on evidence declares that "this rule does not exclude the contradiction of a witness as to any facts immediately connected with the inquiry." The defendants created the connection and the materiality of their whereabouts immediately before 7 o'clock by selecting that as the hour from which to account for themselves during the night, as the probability that they were not strictly accurate must be recognized as absolutely rational. It might have been significantly important to have located these defendants between the hours indicated, as it is easily conceivable that, had it appeared that they were seeking weapons, or cleaning them, it would have, in view of all the circumstances of this case, suggested that they were preparing for a shooting. In Boyle v. State, 105 Ind. 469, 5 N. E. Rep. 207, the court say: "In this instance the accused, when on the witness stand, had given an account of his movements upon a day named, and it was proper to go fully into the subject upon cross-examination, and the state was not confined to the particular period of time designated in the questions asked on direct examination." In Thomas v. State, 103 Ind. 419, 2 N. E. Rep. 820, the court say: "Where a party voluntarily takes the witness stand, and makes a broad denial of the offense charged, whether that denial be in general or specific terms, much latitude should be allowed in the cross-examination. Here appellant's denial put in issue all of the testimony adduced in support of the state's case. If his testimony was true all that in favor of the state was either ignorantly or willfully false." But, in any contingency, it was in the discretion of the trial court to pass upon the admissibility of such testimony, and we will not review its action. Say the court in Disque v. State, 49 N. J. Law, 249, 8 Atl. Rep. 282: "The extent of the cross-examination of a witness into pertinent facts, not touched by the direct examination, is a matter resting

entirely in the discretion of the trial court. Since the ·
passage of the statutes capacitating parties as witnesses,
it has been the general practice, both with respect to
civil and criminal procedure, to permit such testifying
party to be cross-examined as to the whole case; and
such judicial action, being founded in discretion, is not
a matter for which error can be assigned." Say the
court in the case of People v. Clark, 8 N. E. Rep. (N.
Y. App.) 38: "The extent to which he may be cross-
examined on matters irrelevant and collateral to the
main issue, with a view to impeaching his credibility,
necessarily rests in the sound discretion of the trial
court." See, also, State v. Pfefferle, 12 Pac. Rep.
(Kan. Sup.) 406. The jury has found that the defend-
ants were, beyond a reasonable doubt, at the bridge
where Francisco Chavez was shot and murdered; and
doubt whether they were at any point on San Francisco
street during that day, before the killing, may have
existed in the minds of the jury without affecting the
final conclusion that they were at the place of the hom-
icide.

The sixth assignment of error by the court, it is
alleged, was the admission of testimony tending to show
that the defendants were at the saloon of J. V. Conway,
in Santa Fe, on the evening of the killing of Francisco
Chavez, and the exclusion of evidence by
MURDER: admissi-
bility of testi-
mony: judicial
discretion.
the defendants to the effect that the wit-
nesses who swore they saw the defendants in
said saloon were not there themselves dur-
ing the said evening. It was admitted in the argument
that the evidence objected to was admissible if it tended
to show that the defendants were at the said saloon at
7 o'clock, or later, that night, before the killing of
Francisco Chavez; and it appears from the record that
the hour when they claimed they saw said defendants
was not specified, but was stated to have been at sun-
down, which at that season of the year occurred after

7 o'clock. Such evidence, as rebuttal of the defense of the accused, it would have been error to have excluded from the jury, and, as the accused had already had the opportunity to testify in chief that they were at 7 o'clock in the house of Seferino Alarid, it would have been needlessly cumulative to have permitted them to repeat themselves. These defendants had located themselves from 7 o'clock until after the killing of Chavez. Other witnesses gave statements conflicting with theirs, and, if still others were allowed to contradict the last, an interminable counter cumulation would have resulted; and we do not believe it either the duty or the policy of courts to permit such prolixity in their proceedings. But, in any event, the trial judge must be allowed a sound discretion in such matters, and as we do not perceive any abuse of its exercise in this instance, we do not deem it incumbent upon us, or legitimate for us, to reverse his action. Our concluding remarks in the paragraph immediately before that next preceding we here repeat.

The eighteenth assignment is that the court erred in permitting the territory, on cross-examination of the defendants Francisco Gonzales y Borrego and Antonio Gonzales y Borrego, to interrogate said witnesses as to how they had killed Juan Pablo Dominguez a few days after the death of Francisco Chavez, and as to the killing of Silvestre Gallegos by Francisco, and his indictment therefor. It can not be pretended that the evidence of the defendants contributed to the conclusion reached by the jury that the said defendants were at the killing of Francisco Chavez, as the jury, having been instructed to give them the benefit of any reasonable doubt as to their participation in the homicide, and acquit them, must have ascertained their verdict upon testimony in contravention of that of the accused. It is

MURDER: cross-examination of defendants: impeachment: judicial discretion.

immaterial whether Francisco Gonzales y Borrego and
Antonio Gonzales y Borrego killed one Juan Pablo
Dominguez after the death of Francisco Chavez, or at
all, or whether Silvestre Gallegos was killed by Fran-
cisco Gonzales y Borrego. They might have been
shown guilty of such crimes, and yet not have imper-
iled their defense of alibi, if they had been able to
excite by the many witnesses other than themselves,
whom they introduced to support them, a reasonable
doubt as to their presence at the killing of Francisco
Chavez; and, if it was error to admit such inquiries, it
was not such a mistake of discretion as to require
review, for "the asking of incriminating or disgracing
questions is a matter largely in the discretion of the
court, and, where no material injury is thereby done
to either party, the refusal of the court to order such
questions stricken out will not be reversible error."
Section 2087 of the Compiled Laws authorizes the im-
peachment of the credit of a witness by evidence of his
bad moral character, and the present tendency is to
regard all facts as relevant which will enable the jurors
to decide to what extent the testimony of the witness
can be relied on. Accordingly a witness may be asked
with a view to show his character for truthfulness as to
specific facts, not too remote in time, which may tend
to disgrace him, and counsel will be bound by his an-
swers. Underh. Ev., p. 517. Say the court in Terri-
tory v. O'Hare, 44 N. W. Rep. (N. D.) 1008: "We
hold that the right of cross-examination as to outside
matters of fact, which affect the general character of
the witness, and tend to degrade him and affect his
credibility, is, within the limits of sound judicial
discretion, a salutary rule." In Roberts v. Comm., 20
S. W. Rep. (Ky. 1892)267, it was announced proper, in
a prosecution for murder, in order to discredit a witness
for the state, to ask him if he had not been indicted
for robbery and confessed the crime, as it was designed

to affect his credibility.   For the same reason it was declared in State v. Miller, 13 S. W. Rep. (Mo. Sup.) 832, that it was not error to ask a witness whether he had been in the penitentiary two or three years.   In People v. Casey, 72 N. Y. 393, the prisoner was a witness in his own behalf, upon the charges of assault, and the counsel for the people, upon cross-examination, put questions to him as to other altercations in which he had been engaged, and other assaults committed by him, and it was held that there was no error in such ruling.   In Carroll v. State, 24 S. W. Rep. (Tex. Cr. App.) 100, it was decided that, for the purpose of impeaching a witness, he may be asked if he is not under indictment for theft.   We might multiply citations to the same effect, but will conclude with the announcement that in the case before cited (People v. Casey, 72 N. Y. 393) it was declared that the extent to which such an examination may go to test the witness' credibility is largely in the discretion of the trial court, and, as we do not perceive that the judge of the court below committed any impropriety in his election in this instance, we will forbear further consideration of the subject.

It will be sufficient to say in reference to the alleged errors of permitting Ike Nowell to detail an alleged conversation with Thomas B. Catron, one of counsel for the defendants, in reference to the testimony of said Nowell in this case, and in allowing Luiz Gonzales to do the same as to an interview between him and Charles A. Spiess, another attorney for the accused, that we recognize that counsel occupy such relations to their clients as to justify a disclosure of their action in the interest of such clients and for their benefit at their trial.

Many other errors are alleged which we do not deem it necessary to consider, and it may be remarked that in the multitude of assignments there appears

almost a lack of confidence in the substantial merits of the appeal, which impression is not diminished by the technical character of the complaints mainly relied on in the oral argument. Says the supreme court of the United States, in Grayson v. Lynch, 163 U. S. 468, 16 Sup. Ct. 1071: "It is to be regretted that defendants found it necessary to multiply their assignments to such an extent, as there is always a possibility, in the very abundance of alleged errors, that a substantial one may be lost sight of." This is a comment which courts have frequent occasion to make, and one which is too frequently disregarded by the profession. Having reached the conclusion that none of the errors alleged by the accused to have been committed by the trial court were material, and being impressed that the instructions given are a fair, clear, and comprehensive enunciation of the principles by which the jury should have been guided in their consideration of the evidence, we do not discover any ground for reversal of the action of the lower court.

The evidence in the record is abundant to establish that the accused, in pursuance of a diabolical conspiracy of long standing, unlawfully, feloniously, willfully, and purposely shot Francisco Chavez with a deliberate intention to take his life; and the judges of the facts wisely found that there should not be, by their default, any escape for the perpetrators from the penalty for the unprovoked and cold-blooded assassination.

This case may, as to this territory, be pronounced a cause celebre from the prominence of the deceased, from the notoriety of the criminals, from the complication and mystery of the circumstances, from the delay in procuring a jury, from the time (nearly six weeks) and the money (amounting to thousands of dollars) consumed in the trial, from the extent and the intensity of the public interest, and from the excep-

tional skill and zeal displayed by counsel in its management; and it would be extraordinary if such litigation, under such circumstances, did not develop difficulties formidable even to a court of large experience. We are much pleased to say that the presiding judge, though but recently elevated to the bench at the date of this trial, with admirable discrimination and commendable firmness held the scales of justice. In conclusion, we hereby affirm the judgment of the lower court in this case.

BANTZ, J., concurs.

COLLIER, J. (concurring).—In concurring in the result of affirmance in this case, I desire to submit some views upon the indictment, which has been so strenuously attacked by the counsel for plaintiffs in error, and with equal ability defended by counsel for the territory. The attacking counsel have supported their contention with common law authority, and it must be conceded that, if we are to adhere to what the chief justice shows were denominated the "unseemly niceties which are to the law a blemish and a reproach," the attempt on the part of the counsel for the territory in the trial court to employ equivalents of accustomed legal phrases would meet with disaster. This decision in no sense blazes the way of departure in this court from strict common law technicality, even if we did not think that the spirit of our statute had already pointed the road. As early as the case of Territory v. Maxwell, 2 N. M. 250, we find this court announcing, upon the principle of "cessante ratione cessat lex," that the courts of this territory should not follow the common law in prosecutions for embezzlement, as to do so would be to proclaim them powerless to punish in this day and age such an offense. The Missouri courts take a different view, and, while deprecating that they must, yet fear that in capital cases, at least,

innovations even as to form should not be allowed, as
one would know not where they would stop. It is ad-
mitted by those courts that the popular acceptation of
the word "instantly" makes it the equivalent of "then
and there," but they reject the indictment because they
know not to what point a departure will extend. State
v. Reakey, 1 Mo. App. 3; State v. Lakey, 65 Mo. 217.
With due respect for those courts, it appears to me
they mention what might be taken as a most excellent
limit to the "innovation," and they say they will not
go to it. The rule I see no danger in is that stated by
the court, to which this court looks for binding author-
ity, where we find that in an indictment it is sufficient
if time and place is stated "with reasonable certainty."
Ball v. U. S., 140 U. S. 119, 11 Sup. Ct. 761. Can it
be doubted that both the court of appeals and the su-
preme court of Missouri, if they considered that the
popular acceptation of the word "instantly" was "then
and there," would not have held indictments bad for its
being used for "then and there," if they had recog-
nized the rule of "reasonable certainty?" It is unnec-
essary to pursue this subject further as to the word
"instantly," in view of its thorough discussion in the
main opinion in this case, but I have thought there
should not have been all omission in reference to the
Missouri cases called to our attention, of which, how-
ever, it may be said that the latter ones seemed to pro-
ceed upon the theory that they must lie on the Pro-
crustean bed which Judge NAPTON, in Lester v. State,
9 Mo. 666, set up in Missouri jurisprudence.

The indictment is also claimed to be bad and the
verdict unintelligible, or at least not intelligible, for
murder in the first degree, because murder in that
degree is not exclusively charged. Again, we are re-
mitted to the doctrine of equivalents. While a proper
charge of murder in the first degree, as the pleader
must have intended to charge this, would be that the

defendants did unlawfully, willfully, deliberately, and premeditatedly and with malice aforethought, kill, etc., he employs the words "unlawfully, feloniously, willfully, purposely, and with express malice aforethought, did," etc.  Inasmuch as we ascertain that the statutory definition of express malice is a deliberate intention unlawfully to take away the life of a fellow creature, we may make another arrangement of words by equivalents; not equivalents, if objection may be made, that are so held by popular meaning, but equivalents as the statute says.  Instead of the words in the indictment, we say, "did unlawfully, willfully, feloniously, purposely, and with the deliberate intention aforethought to take away the life of one Francisco Chavez, then and there a fellow creature," and thus we have every word in the statute except "premeditated," and in its place "aforethought."  To ascertain whether "premeditated" is strictly necessary to define murder in the first degree, may perhaps be best done by seeing if the words we have could possibly define murder in the second degree, or a killing, which is statutorily called murder in the third degree.  We will use our statutory substitution for the words of the indictment in an attempt to join with them words descriptive of murder in the second degree, to wit, "did unlawfully, feloniously, willfully, purposely, and with the deliberate intention aforethought then and there to take away the life of one Francisco Chavez, and without design to effect the death of said Francisco Chavez, while he, the said Francisco, was then and there engaged in the commission of a misdemeanor" (specifying the same), and so through with the different allegations which constitute murder in the second degree in its different phases.  This collocation of words plainly expresses a contradiction creating an absurdity.  Test these words by joining them with the words descriptive of murder in the third degree, and the contradiction in terms becomes

equally palpable.  It is.evident, however, and admitted on the argument ·by the able counsel for plaintiffs in error, that murder is charged in some degree, if the words "instantly died" may stand.  I think it not an unfair method of ascertaining whether or not murder in the first degree is charged to show that it is impossible for these words to fit in the description of any other degree known to our law.  Of course, it does not follow that because a lower degree is not described a higher degree must be, but it is legitimate to argue that equivalents in description, and· especially if they are statutory equivalents, can by no stretch of construction apply elsewhere.  As already said, we have, by substitution· of the statutory definition for express malice, every word in this indictment that the statute calls for, except "premeditated."  Instead of "deliberately and premeditatedly," we have"with the deliberate intention aforethought to take," etc.  I think the indictment clearly sufficient after verdict, and that it charges murder in so exclusive a way, under our statute, as to make the verdict plainly intelligible.  The record in this case I consider free from reversible error.

PER CURIAM.—The record in this case, as it was originally brought into this court, did· not show that the defendants had been arraigned and had pleaded to the indictment.  While the cause· was here, an application was made to the district court where the defendants had been tried and convicted, in which it was averred that in truth and in fact the defendants had been arraigned and had pleaded not guilty before the trial below, and that the arraignment ·and pleas were omitted from the record by the inadvertence of the clerk.  The district court was asked to order the correction of the record in these particulars by an entry nunc pro tunc.  The application was presented in the presence of the defendants and their counsel, after due

notice; and, after considering it, and the proofs submitted on both sides, the district court granted the motion. The solicitor general then appeared in this court, suggested the diminution of the record here, and on his motion a certiorari was issued to the clerk of the court below, who thereupon sent up the record as amended, in which the arraignment and pleas of not guilty appeared as entered therein nunc pro tunc. A bill of exceptions was also prepared by the defendants covering the transactions which occurred on the proceedings to amend the record. The bill of exceptions was duly approved by the court, and has been brought here also on the certiorari by agreement of the parties. We have treated the matters of alleged error in this bill of exceptions assigned in the defendants' objection and protest as though it were a part of the principal case, and not as an independent proceeding. 1 Elliott, Gen. Prac., sec. 192. The district court, in the nunc pro tunc proceeding, acted with entire regularity, and its conclusion is abundantly supported by the proofs adduced, and no error is disclosed therein. The only question is as to whether the district court had any power to amend the record at all. This power is denied by counsel for defendants upon the following grounds: (1) That the amendments can be made in only those cases where there are some written memoranda on file in the cause on which the amendments may be based; (2) that, after the term has expired, inaccuracies in the record can not be corrected or omissions supplied by nunc pro tunc entries; (3) that they can not be made in criminal cases; (4) that they cannot be made by an inferior court while the cause is pending in a superior court on writ of error; and (5) that Judge Hamilton, who presided at the trial of the defendants, and made the nunc pro tunc order, was not clothed with judicial power to act in the premises.

1.    The first of these grounds does not really relate to the jurisdiction or power of the court, but merely to the proofs which should be required, and in that aspect we considered this question in examining the bill of exceptions just mentioned, but we will express our opinion more fully upon this point at this place.   The authorities are not harmonious as to the character of the proofs required to support nunc pro tunc entries.   In Waldo v. Beckwith, 1 N. M. 103, and Secou v. Leroux, Id. 390, we held that the facts upon which the discretion of courts to amend records now as of then may be exercised should be "confined to their own records and to the officers in immediate connection with the courts." The rule of practice which has obtained in this territory since 1854 does not, therefore, require any written memoranda, if the facts warranting the amendment can be gathered from the officers in immediate connection with the court.   Though the rule may be more restricted in some jurisdictions, we think Waldo v. Beckwith and Secou v. Leroux are supported by the weight of authority, and we see no reason for departing from it now, so far as it is applicable to this case.   In a recent case the supreme court of the United States held that the circuit court could amend a record in a criminal case by an order nunc pro tunc, based upon a recollection of the facts by the judge.   The court in that case, per Justice MILLER, say the first impression was that the power of the court over its own record to make such amendments after the expiration of the term was limited to those cases in which there remained some written memoranda in the case among the files of the court, by which the record could be amended if erroneous, or the proper entry could be supplied if omitted; "but," say the court, "we are satisfied, however, upon an examination of the authorities, that this restriction upon the power of the court does not exist."   In re

*(margin note: AMENDMENT of record nunc pro tunc: proofs required.)*

Wight, 134 U. S. 137, 10 Sup. Ct. 489. In Kelly v.
U. S., 27 Fed. Rep. 616, it was held that the record
could be corrected on the recollection of the judge after
the term had expired. In the case at bar the facts of
arraignment and pleas of not guilty were shown by the
affidavits of the clerk, the sheriff, and district attorney,
and the stenographer of the court, whose notes and a
verified transcript thereof were also produced. The
order sets forth that upon such evidence, and upon the.
recollection of the judge of the fact of such arraign-
ment and pleas of not guilty before the commencement
of the trial, the record was corrected according to
the facts. The order is supported by the oaths of
officers in immediate connection with the court, the
stenographic notes of a sworn officer, which belong to
the files of the court, and the recollection of the facts
by the presiding judge. Moreover, this conclusion is
supported by the recital in the record that, "issue
being joined," the trial was had, and a verdict of guilty
was returned. This was sufficient alone, in our opinion,
to justify the amendment since made, as the only issue
which could have been joined upon which the verdict
of not guilty would be responsive would be upon a plea
of not guilty after arraignment.

2. There is diversity of opinion as to the source
of the power to make nunc pro tunc entries, but there
is none as to the existence of the power to
make the records now as of then conform
to and speak the actual truth of past trans-
actions, where, by the neglect or inadvertence of the
clerk, an omission has occurred, or a false entry has
been made. Mr. Elliott is of the opinion that the
power did not arise from the statute of Henry VI., but
is inherent. 1 Elliott, Gen. Prac., sec. 192. Other
authorities, we think correctly, take the same ground.
Balch v. Shaw, 7 Cush. 284; Fuller v. Stebbins, 49
Iowa, 376; Crim v. Kessing, 89 Cal. 478, 26 Pac. Rep.

*Correction of
record after ex-
piration of term.*

1074; Works, Courts, p. 171. Our statute, however, allows nunc pro tunc entries to be made "whenever the ends of justice may require it." Comp. Laws 1884, sec. 1836. This statute is not confined to civil cases. The period in which this power could be successfully invoked is not limited to the term at which the transaction occurred. In one instance it was employed after the lapse of twenty-three years. Freem. Judgm., sec. 56. In a series of cases the supreme court of the United States has allowed such corrections years after the expiration of a term. The power thus possessed to at any time make the record speak the truth is, of course, not to be confounded with the correction of an erroneous or deficient order or judgment, truthfully entered, which must, of course, be made during the term. In the time of Edward I, Chief Justice HENG-HAM and his fellow judges were heavily fined for so altering the records to speak falsely, and a tradition prevailed that a clock house was built at Westminster Hall from these fines. Lord COKE says that in the time of Elizabeth "Sir Robert Catlyn, chief justice of England, would have had Justice Southcote (one of his companions, justice of the king's bench) to have altered a record, which the justice denied to doe, and said openly in court 'that he meant not to build a clock house.'" 1 Champ. Ch. Just. 112. BLACKSTONE says the severity of the proceedings against Hengham and his companions seems to have alarmed the succeeding judges that through fear of doing wrong they hesitated at doing that which was right, and, because Britton had forbidden alterations to make the records speak a falsity, "they conceived that they might not judicially and publicly amend it to make it agreeable to the truth;" so that "the legislature hath therefore been forced to interpose by no less than twelve statutes to remedy these opprobrious niceties. Its endeavors have been of late so well seconded by judges of a more

liberal cast that this unseemly degree of strictness is almost entirely eradicated, and will probably, in a few years, be no more remembered," etc. 3 Bl. Comm. 409. We think it quite clear that the power is not one evolved by modern cases, as counsel for defendants has insisted in his argument and brief. If the power was derived from the common law, then, even though it had not been authoritatively declared by judicial decision until recent times, it would be none the less operative in this territory. The decisions of the courts are merely evidence of what is common law. 1 Bl. Comm. 70, 71. Our statute, which makes the common law the rule of practice and decision, has not provided for a rigid body of laws found only in statutes enacted and decisions rendered prior to the Revolution, incapable of expansion, and inflexible, like a code. The law concerning corporations, libel, and indeed upon every subject, has been greatly modified or extended and improved since then by the gradual process of judicial decision, and it is one of the greatest virtues of the common law that it can be so molded to meet the needs of social development.

3. It is also urged that, whatever the power may be in civil cases, it does not extend to those criminal. This point was expressly ruled against in AMENDMENT of record by order 134 U. S. 137, 10 Sup. Ct. 487. In nunc pro tunc: extent of power. Bilansky v. State, 3 Minn. 427 (Gil. 313), the court say: "The fact that the case is a capital one is in no way an absolute bar to its exercise, but it should be served to inspire the court with so anxious a solicitude to be right as to insure certainty. We can see no good reason why the court should not have made the amendments that it did in this case." In Benedict v. State, 44 Ohio St. 679, 11 N. E. Rep. 125, it was also held "this power may be exercised in criminal prosecutions as well as in civil cases." Elliott says, "Recitals omitted by mistake in criminal cases

may be supplied by entries now for then." 1 Elliott, Gen. Prac., sec. 192. The same rule was laid down in Ex parte Jones, 61 Ala. 399, and was fully recognized to apply to criminal cases in 1 Bish. Cr. Proc., sec. 1343; Kelly v. U. S., 27 Fed. Rep. 616; State v. Farrar, 104 N. C. 702; 10 S. E. Rep. 159; Freel v. State, 21 Ark. 226; State v. Primm, 61 Mo. 166.

4. It is also said that, as the cause was pending in the supreme court on writ of error, the district court could not amend the record. There is no reason why any distinction should be taken in this respect between appeals and writs of error. Perhaps it might be more regular to remit the record to the court below for correction, but it has been quite generally held that the removal of the cause by writ of error does not deprive the court below of the power to amend its record so as to make it conform to the truth. Freel v. State, 21 Ark. 226; Stebbins v. Anthony, 5 Colo. 342; Stephens v. Bradley, 2 S. Rep. (Fla.) 667; Pleyte v. Pleyte, 24 Pac. Rep. (Colo. Sup.) 579; Ross v. Steel Works, 34 Ill. App. 323; U. S. v. Vigil, 10 Wall. 424. And in Kelly v. U. S., 27 Fed. Rep. 616, it was allowed after the cause had been transferred from the circuit to the district court.

*POWER of amendment after removal of cause by writ of error.*

5. It is also objected that Justice Hamilton was not clothed with judicial power in the premises. Upon this point it is contended that under the organic law of the territory Justice Laughlin was the only judge having power to act in the First judicial district court, and that Judge Hamilton, although an associate justice of the supreme court, could not act, even though Judge Laughlin was disqualified by reason of his relation as counsel for the prosecution before his appointment to the bench; and the courts may thus become powerless to perform their duties. The whole

*QUALIFICATION of associate justice to sit outside of his district: construction of statutes.*

of the judicial power of the territory is vested in the supreme, district, and probate courts and justices of the peace. Act Sept. 9, 1850, sec. 10. The jurisdiction, original and appellate, shall be as limited by law. The supreme and district courts shall possess chancery and common law jurisdiction. Under the same act (1850) it was also provided that the territory shall be divided into three judicial districts, and a district court shall be held in each of said districts by one of the justices of the supreme court, at such time and place as may be prescribed by law; and the said judges shall, after their appointments, respectively reside in the district which shall be assigned them. It will be noted that the judicial power which is thus vested in plenary terms in the district courts is to be exercised in each district "by one of the justices of the supreme court." It does not require that it shall be exercised by any particular one of the justices; and while, for the convenience of the public, a judge is to be assigned to each district, who is required to reside therein, there is no express or implied prohibition upon any judge against exercising power in any district not the one to which he has been assigned. There is nothing in the language of that clause requiring such a construction as will confine the exercise of the power to the particular justice assigned to the district, when that person is otherwise incapacitated. We have been cited to Stanley v. U. S., 1 Okl. 342, 33 Pac. Rep. 1025, as an authority holding a different opinion. We entirely agree with the court in that case that the district courts are creations of the federal congress and derive their powers and authority from the laws of the United States; but we also recognize that congress has said that the judicial power of the district courts is to be exercised "by one of the justices of the supreme court," and we cannot agree that the requirement that a justice shall be assigned to and reside in a district—a provision designed merely

for convenience—is sufficient, it may be, to paralyze the administration of justice, or, on the other hand, force a judge to preside who is unfitted by reason of his interest in the cause, or his previous employment as an attorney in the case. Moreover, the records of this court show that no assignment has ever been made of any judge to any particular district. In the year 1858 it became desirable to hold court at more than one place in each district, and congress granted authority for the holding of court in each county. There is nothing in this act (June 10, 1858) amounting to the prohibition contended for, and the maxim, "Expressio unius exclusio alterius," has no application whatever. It is idle to contend that such language is sufficient to block the wheels of criminal justice.