ANNE BILANSKY, Plaintiff in Error, *vs*. THE STATE OF MINNESOTA, Defendant in Error.

ERROR TO THE DISTRICT COURT OF RAMSEY COUNTY.

The District Court has the power to amend the record in a capital case, so as to make it conform to the truth, after the term has passed in which the record was made up; when there exists no doubt about what the truth is.

The jury should be allowed to separate during the ordinary intervals of adjournment of lengthy trials in capital cases, where no special reason exists for denying it, and such separation is no ground of error, unless it be made to appear that improper influences were exerted upon the jury, in consequence of their separation.

The statute of the State providing what indictments must contain, was intended to strip them of all technical language in charging or describing the offence and bring the same within the comprehension of the prisoner, as well as his Counsel, and where the form of an indictment is given by the statute, and declared to be sufficient for any purpose, nothing short of its leading to absurd results, or conflicting with some constitutional provision, would justify the Court in disregarding it.

An *indictment charged the Defendant with murder in the first degree*, in words, and also in the description of the offence. The jury found the Defendant "guilty of the crime as charged in the indictment." *Held*—that it is only when the jury acquit of the main charge, and convict of some inferior degree thereof, or, (under an authority such as our statute contains,) they "acquit the Defendant of a part of the offence charged, and convict of the residue thereof," or, find the Defendant "not guilty of the commission thereof, and guilty of an attempt to commit the same," that any special matter need be stated in the verdict.

The Defendant below having been convicted of the crime of murder in the first degree, moved ·in arrest of judgment upon certain grounds which were claimed to be disclosed by the record, and which are enumerated in the opinion of the Court.

W. A. GORMAN, Counsel for Appellant.

I. V. D. HEARD, Prosecuting Attorney, Counsel for the State.

*By the Court*—FLANDRAU, J.    The Defendant was convicted of the crime of murder in the first degree at the May term of the District Court of Ramsey County. She moved the District Court for a new trial on ground of error claimed to have been committed on the trial by the Court. This motion was denied by the District Court, and the decision reviewed and affirmed by this Court, on the record being certified up by the Judge. The case was then remanded to the District

Court for sentence upon the verdict. A motion was then made by the Defendant in arrest of judgment upon certain grounds which were claimed to be disclosed by the record, and which may as well be particularly enumerated here as elsewhere. They were substantially as follows :

1.   That no officer was sworn to take charge of the jury when they retired to make up their verdict.

2.   That all the jurors were not sworn as prescribed by law.

3.   That after the verdict was rendered it was not read to the jury, and they asked if it was their verdict.

4.   That the record had been changed in respect to the polling of the jury without leave of the Court, &c.

5.   That during the progress of the trial the jury were permitted to separate by consent of Counsel.

6.   That one of the jurors appears to have been absent at the call of the jury, and not to have returned.

7.   That the indictment does not charge a public offence.

8.   That the verdict does not find as a fact the degree of murder in which the Defendant was found guilty.

The Prosecuting Attorney finding on an examination of the record, that it did not present a true history of the proceedings, moved the Court at the time the motion in arrest of judgment was to be argued, to amend the record, by conforming it to the truth and making it show—

1.   That each juror was sworn as prescribed by law.

2.   That when the jury retired they were put in charge of an officer who was duly sworn to keep them as prescribed by law.

3.   That upon each adjournment of the trial, and before the charge of the Court, the jury were permitted to separate with the consent of the Defendant.

4.   That the jury were polled at the request of the Defendant on the coming in of the verdict, and each assented to it. That it was then entered and read over to the jury, and by them again assented to.

No objection was made by the Counsel for the Defendant, that any of these proposed amendments were misstatements of

the facts as they occurred upon the trial, but it was denied upon her behalf that the Court had power to amend its record in a criminal case after the term at which the trial was had. The Court permitted the amendment to be made, which will confine our examination to the questions—

1.   Whether the Court could allow amendments to be made of this character after the term of the trial.

2.   Whether a jury can be allowed to separate at all in a capital case, even with the consent of the Defendant.

3.   Whether the indictment is sufficient ; and

4.   Whether the verdict not finding specifically the degree of the crime in which the jury convicted the Defendant, is error.   All the other questions being cured by the amendments which were made, if such amendments can be sustained.

Blackstone ( *Vol.* 3, *p.* 407,) in treating of the amendment of record, says that it was formerly held that no amendment could be made after the term at which the judicial act was done.   But he says, that now all proceedings are considered as *in fieri* until judgment is given, and, that till then they have power to admit amendments by the common law.   The same writer says that in the early history of English jurisprudence the pleadings were all *ore tenus*, and great liberality in amendments were allowed.   Judgments in those days were entered up immediately by the clerks and officers of the Courts, and if any misentry was made, it was rectified by the minutes, or by the remembrance of the Court itself.   Abuses grew up under this system of amendments, and about the 13th of Edward the First, the King declared through the treatise by Britton, "that although we have granted to our justices to make record of pleas pleaded before them, yet we will not that their own record shall be a warranty for their own wrong, nor that they may rase their rolls, nor amend them, nor record them contrary to their original enrollment," which Blackstone declares, meant only that the justices should not by any private rasure or amendment alter a record originally made up according to the truth, to any sinister purpose.

Shortly after this the king prosecuted almost all his justices

for corrupt practices, and punished them by severe fines and penalties, and in one case, at least, with most unjust severity. In consequence of this condition of things, the justices resolved never in any case to touch a record, and held that even palpable errors, when enrolled, and the term at an end, were too sacred to be rectified or called in question. This strictness, the effect of timidity and sullenness on the part of the judges, resulted disastrously to suitors, and judgments rendered upon a full trial upon the merits were frequently reversed for slips of the pen or misspellings. The Legislature were forced to interpose, and Blackstone cites twelve statutes that were passed to remedy these "opprobrious niceties." He says that by the aid of more liberal judges, this unseemly degree of strictness is almost entirely eradicated : and will probably in a few years be no more remembered than the learning of essoigns and defaults, or the counterpleas of voucher are at present."

I have quoted thus copiously from these commentaries, to show that the spirit of strictness claimed for the practice in respect to the amendment of records, took its rise, not in the wisdom which characterizes the body of the English common law, but from influences which have long ceased to operate, having yielded to the progress made in the science of jurisprudence; the sole aim of which, now, is the discovery of truth, and the promotion of justice.

While we would go as far as any Court in reprobating a rule which would place the proceedings of a Court almost entirely at the mercy of the subordinate officers thereof, we would be scrupulously careful in adopting any rule which would tend to destroy the sanctity or lessen the verity of records. And while we admit the power to amend a record after the term has passed in which the record was made up, we would deprecate the exercise of the power in any case where there was the least room for doubt about the facts upon which the amendment was sought to be made. If a jury is sworn according to law, or any other of the ordinary proceedings takes place in the progress of the trial of a cause, and the clerk omits to record the fact, we can see no reason why the record should not be made to conform to the truth, even after the term, when there

exists no doubt about what the truth is. Every reason is in favor of such change being made: public justice demands it, as well for the punishment of the offender as for the protection of the accused, according as the nature of the proposed amendment may operate. The rule limiting the amendment of records to the term in which they were made up, which was fixed by the old practice, and is contended for by the Defendant's Counsel here, was adopted on the ground alone that the Court and parties interested would be more capable of safely arriving at the truth while the transaction was fresh in their minds, than at a more remote period, and the wisdom of such limitation is manifest wherever the facts of the particular case fall within the reason upon which it stands; but when the facts stand undisputed, and the objection is based upon the technical point alone that the term has passed at which the record was made up, it would be doing violence to the spirit which pervades the administration of justice in the present age to sustain it. It is our opinion that this power of necessity exists in the District Court, and that its exercise must in a great measure be governed by the facts of each case. The fact that the case is a capital one, is in no way an absolute bar to its exercise, but should serve to inspire the Court with so anxious a solicitude to be right, as to ensure certainty. We can see no good reason why the Court should not have made the amendments that it did in this case. *See State vs. King*, 3 *Iredell*, 411; 5 *Iredell*, 12; 7 *Eng.* 62; 3 *McLean*, 379; 9 *Ala.* 547; 1 *Branch*, 437; 2 *Ala.* 161; 35 *Maine*, 138; 4 *California*, 238; 2 *Burrows*, 1098, 1760; 4 *Burrows*, 2527; 7 *Durn. & East.* 55; 6 *Durn. & East.* 543; 4 *East. Rep.* 175; 1 *Salk*, 51.

In discussing the propriety of allowing a jury to separate in a capital case during the recesses taken, pending the trial, I cannot express the views of the Court better than by copying the argument made by the learned Judge who tried the cause below, when giving his opinion on the motion in arrest of judgment now under review; and I will preface his remarks by stating that this question is presented upon the naked fact of a separation having taken place, as there is no pretence made that any improper influences whatever were exerted upon the

jury in consequence of their separation. He says, "If this proposition be good law, (that a jury cannot separate,) trial by jury, practically, will in many cases prove but a solemn farce. Some other method will have to be devised to protect the interests of society and mete out justice to criminals. Few trials of any importance can be begun and concluded during a single session. Adjournments must consequently take place. The physical powers of jurors would not suffice in many instances without food and rest. The necessities of nature cannot be disregarded, whether the trial be protracted or brief. But if a separation is fatal, what can be done? There are many occasions during a trial when there must be at least a temporary separation—a juror may become faint or sick and need fresh air, or a short period of rest or seclusion. * * * * * In former times, when jurors were comparatively ignorant, and subservient to the Court or the Government, when criminals were not allowed the aid of counsel, and consequently when long speeches were unknown—when no trial occupied an entire day, it was the practice to keep a jury together from the time they were empanneled until they rendered their verdict. This rule was carried so far that if a jury could not agree during the term of Court in the county or town where the trial was had, they were taken to the place where the next term of the same Court was to be held, and kept in confinement until a verdict was had. Food and drink were denied them, and the terrors of starvation were added to the irksomeness of imprisonment in order to extort a verdict. But this strictness gradually became relaxed, as might be expected, since it was more appropriate to a barbarous than a civilized age, and juries were at length permitted to separate in civil cases, and in misdemeanors. The innovation was stoutly resisted, but reason and good sense prevailed, and the rule was established that a separation in such cases, though without consent of parties or the Court, would not vitiate the verdict, unless there was ground to suspect that some abuse had resulted, or some undue influence had been brought to bear upon the jury in consequence of such separation.

One of the earliest cases reported on this subject, is *The*

*King vs. Wolf, et al.*, 1 *Chitty Rep.*, 401. The cause commenced early in the morning and continued until eleven o'clock at night, without being terminated. Abbott, Ch. J., told the jury they might return to their families, but instructed them not to have any communication with any one touching the matter in issue.

On motion to set aside the verdict, Abbott, Ch. J., said, "it became matter of necessity that the trial should be adjourned. * * * * It seems to me that the law has vested in the Judge the discretion of saying whether or not, in any particuler case, it may be allowed to the jury to go to their homes during a necessary adjournment throughout the night." Bailey, J., said, "In almost every trial it is the experience of persons who attend Courts of Justice, that the Judge as well as the jury, are occasionally absent for a short period. If then a separation of a night might vacate a verdict, why may not a separation of two minutes vacate a verdict?" * * * * * "When the fact of separation *per se* is argued as a ground for a new trial, it is of no weight."

Holroyd, J., said, "I do not find any authority in law which says that the separation of the jury in a case between party and party, or in case of a misdemeanor, does avoid the verdict."

Best, J., said, "I cannot discover any distinction between a separation for a minute, and a separation for a considerable period of time. If the argument is right, it is right to this extent, that if by any accident a juror gets out of the box for a single minute, it is a mistrial. * * * * * It appears to me that mischief can result from allowing jurors to separate, a discretion being always vested in the Judge as to the propriety or impropriety of keeping them together in each particular case."

Though this was a trial for a misdemeanor, yet the reasons advanced by nearly all the Judges, apply with equal force to cases of felony. There is the same need of an adjournment— the same necessity for relaxation and rest—the same chances of accidental separation, as suggested by Best, J.

The importance of keeping the minds of jurors free from

improper or disturbing influences in all cases, especially criminal cases, is conceded, but it is denied that confinement is necessary to secure that result.   Twelve active business men, taken fresh from their daily avocations, their families and domestic companionship, and kept together constantly for days or weeks as jurors in a criminal cause, are not likely, as it seems to me, when the cause is finally submitted to them, to receive it with that healthy tone of mind—that freedom from prejudice and bias which the determination of grave and solemn issues demands.

And in view of the well known practices of jurors who are kept together for any considerable period of time, to engage in questionable amusements and other devices to relieve the weary flight of time, I much question whether separation ought not to be the rule, and non-separation the exception.

It seems to me that a juror who is permitted under proper instructions, to spend the usual hours of adjournment with his family; to cast a brief glance over his business; to take his usual food, exercise and rest, is, and must be, in a far better and sounder condition to sit in judgment on the life of a fellow being, than one who is denied these privileges, and is compelled to associate with eleven other men whose habits may be dissimilar and distasteful, and each of whom is likely to do something he would not otherwise attempt, except as an antidote to an irksome and oppressive confinement.   Of course regard is to be had to the state of feeling in the community upon the subject matter of the trial, and in respect to the Defendant, and this should regulate and control the exercise of the power, but when the public mind is free from prejudice and excitement, and the jury is ordinarily honest and intelligent, a separation during the ordinary intervals of adjournment, will not practically work any injustice to the Defendant, nor render the jury any less capable of giving a true verdict, and "if this be true in practice, the mere fact of such separation is no error in law."

Such is the reasoning of Judge Palmer upon the principles which should govern this question, and we think he proves

conclusively that separation should be allowed in all lengthy trials, where no special reason exists for denying it.

For authority on this point see *King vs. Wolf*, 1 *Chitty R.*, 101; *Sargent vs. State*, 11 *Ohio*, 274; *Eagles vs, State*, 13 *Ohio*, 490; *Davis et al. vs. State*, 15 *Ohio*, 72; *State vs. McKee*, 1 *Bailley*, 651, *this is a capital case in South Carolina; State vs. Austin*, 2 *Bailley*, 265, *also capital; State vs. Miller* 1 *Devereux & Battle, N. C. Rep.*, 500, *also capital; State vs. Kinney*, 2 *Gilman*, 540; *Graham & Waterman on new trials*, vol. 2, *p.* 493; *People vs. Douglass*, 4 *Cowan*, 26, 1 *Conn.* 401; 1 *Blackf.* 25; 5 *Iredell*, 58; 7 *N. H.*, 587; *The People vs. Stevens*, 19 *N. Y. Rep.*, 549.

The rule differs in some of the States. In Tennessee and Pennsylvania, a jury cannot separate in a capital case. 3 *Harris*, 468; 11 *Humphrey*, 502. The same has been held in Louisiana. 11 *La. Rep.*, 283; 2 *La. Cases*, 510.

The indictment in this case follows the form provided by statute; it in fact goes farther, and is more full than the strict requirements of the act seem to demand. The statute provides as follows: (*R. S., old ed., p.* 543, *Sec.* 66.) "The indictment must contain,

"1st. The title of an action, specifying the name of the Court to which the indictment is presented, and the name of the parties.

"2d. A statement of the facts constituting the offence, in ordinary and concise language, without repetition, and in such manner as to enable a person of common understanding to know what is intended.

"*Sec.* 67. It may be substantially in the following form:" (Then follow forms for the several different offences; the first of which is murder.) It is evident from the provisions quoted, that the intention of the Legislature was to strip indictments of all technical language in charging or describing the offence, and bring the same within the comprehension of the prisoner as well as his counsel. The objection that the Defendant's Counsel makes to this indictment, is that it does not charge a public offence, in that it does not charge that the poison was taken into the stomach of the deceased, and that he died there-

from. The language used in the indictment is that the Defendant "wilfully, feloniously and without the authority of law, with malice aforethought, killed and murdered Stanislaus Bilansky with a premeditated design to effect his death, by administering to him in said city poison, to wit, arsenic, &c." Had the form not been given by, and been incorporated into the statute, we think that the one used would have fully satisfied its other requirements. It would need an effort of an ingenious mind to misapprehend the offence charged, or involve a degree of mental imbecility which would go far towards absolving the accused from criminal responsibility, to be misled by it. Where a form is given by a statute, and declared to be sufficient for any purpose, nothing short of its leading to absurd results, or conflicting with some constitutional provision, would justify a Court in disregarding it. The indictment is clearly sufficient.

The only remaining question · necessarily involved, is, whether the jury should have found specially as a fact, the degree of murder in which they convicted the Defendant.

The Counsel for the Defendant insists that as there are several degrees of murder, it is necessary in all cases to specify in the verdict the degree in which the jury intend to convict. It is true that all the lesser degrees are involved in the first or greater, and that on an indictment charging the highest degree, a conviction may be had for such of the lower ones as the proof may warrant. *Stats. of Minn., New Ed., p.* 783, *Sec.* 20 *marginal.* "Upon an indictment for an offence consisting of different degrees, the jury may find the Defendant not guilty of the degree charged in the indictment, and guilty of any degree inferior thereto. Upon an indictment for any offence, the jury may find the Defendant not guilty of the commission thereof, and guilty of an attempt to commit the same. Upon an indictment for murder, if the jury find the Defendant not guilty thereof, they may upon the same indictment find the Defendant guilty of manslaughter in any degree."

There is one more provision of statute bearing somewhat

upon this question, which is found on *page* 776 *of the New Edition of the Statutes, Sec.* 43 *marginal :*

"Whenever any person indicted for a felony, shall on trial be acquitted by verdict, of part of the offence charged in the indictment, and convicted of the residue thereof, such verdict may be received and recorded by the Court, and thereupon the person charged shall be adjudged guilty of the offence, if any, which shall appear to the Court to be substantially charged by the residue of such indictment, and shall be sentenced and punished accordingly."

The indictment in this case charges the Defendant with murder in the first degree in words, and also in the description of the offence. The jury rendered a verdict in these words: "They find the Defendant, Anne Bilansky, guilty of the crime as charged in the indictment." Now there is but one crime charged in the indictment, although certain contingencies happening, one of which is the "finding the Defendant not guilty of that charge," the jury may convict of another. The usual verdict in all criminal prosecutions where the jury convict of the full offence charged in the indictment, is simply the word "guilty," in response to the inquiry by the Clerk as to whether they find the prisoner guilty or not guilty, and that covers the whole charge made. It is only when the jury acquit of the main charge, and convict of some inferior degree thereof; or under an authority such as I have cited from our statutes, acquit the Defendant of a "part of the offence charged, and convict of the residue thereof;" or find the Defendant "not guilty of the commission thereof, and guilty of an attempt to commit the same," that any special matter need be stated in the verdict. But even if the statute made it necessary to state in the verdict the degree in all cases of conviction, it would admit of very little question or doubt, that a verdict such as the one rendered in this case would satisfy the law. The indictment charges murder in the first degree. The verdict convicts of the crime charged in the indictment. Whether greater certainty would be attained, by adding thereto the words, to wit: "murder in the first degree;" or whether such a clause would be mere tautology, is

susceptible of too much doubt to allow error to be predicated upon the omission.

We have given this case a careful consideration on the merits of every question that was presented to us; but we disapprove the practice of witholding questions from the Court, when a case is before it on the whole record, as this was when certified up by the Judge of the District Court, and subsequently raising them on a motion in arrest of judgment when the case has been remanded. Where writs of error do not issue of course, an omission to make a point when a full opportunity is presented, might be taken as an answer to an application for a second writ. There were however peculiar reasons attending this case which absolve all parties connected with it from censure in this respect.

The decision of the Court below is affirmed.