## Happy Coal Co. v. Brashear
(Decided Dec. 13, 1935).

CRAFT & STANFILL for appellant.

JESSE MORGAN for appellees.

OPINION OF THE COURT BY DRURY, COMMISSIONER— Affirming.

This is an appeal from a judgment for $2,230.50 recovered by Felix Brashear et al., entered July 17, 1934, the enforcement of which has been stopped by a supersedeas served on them August 16, 1934. There were other claims and another defendant, but on this appeal we are dealing only with the claim of $2,230.50 and the Happy Coal Company.

### Claims Sued On.

Plaintiffs alleged that on March 6, 1917, they executed a written lease by which they let to A. C. Rhinehart for 50 years the exclusive right to mine and remove coal from 450 acres of land at a royalty of 9 cents per ton. That on December 7, 1928, Rhinehart sold all his rights in the leased premises to the defendants, and that the defendants are indebted to plaintiffs $2,257.21 for royalty on coal mined by them under said lease. This royalty was past due, and payment had been demanded of the defendants.

### The Answer.

Defendants in their original answer denied owing plaintiffs anything, denied any royalty was past due, or that payment had been demanded or that they had promised to pay it.

### The Amended Answer Tendered.

On the day this case was called for trial, the Hap-

py Coal Company tendered an amended answer in which it denied it was the owner of this Rhinehart lease, denied that it had mined any coal under it, had rendered plaintiffs any statements of royalties on any coal mined under it, or had promised to pay plaintiffs any part of the royalty sued on.

The court refused to permit this answer to be filed, and that is one of the grounds urged for reversal, but as the plaintiffs, in order to succeed, did prove everything they would have had to prove under the amended answer, we cannot see how the Happy Coal Company was prejudiced by the court's refusal to file it.

### The Proof.

Evidence for the plaintiffs established that the defendants had been mining coal under this Rhinehart lease for several years; that they had fallen behind in their royalties; and that by payments made the royalties due were some years ago reduced to a balance of $1,000, which they refer to as "the back royalty"; and that on September 5, 1932, they wrote the attorney for the plainiffs a letter containing this:

"In order to satisfy the Messrs. Brashears and show our good faith although the times are strenuous and business bad we will hereafter pay $200.-00 on the 25th day of each month on back royalties until same are paid. And will keep up current royalties."

They did neither, and this suit was for:

Back royalty ............................$1,000.00
Royalties falling due November 1st, 1932.... 344.25
Royalties falling due December 1st, 1932.... 219.87
Royalties falling due January 1st, 1933..... 280.44
Royalties falling due February 1st, 1933.... 248.13
Royalties falling due March 1st, 1933...... 164.52

Total ..............................$2,257.21

The plaintiffs checked over the books of the two coal companies and found they had made an error against themselves in the statements rendered plain-.

tiffs of $26.71 for which they were given allowance, and judgment taken for $2,230.50. From letters in this record written by and for the defendant, it is evident that the only reason this had not been paid was lack of funds.

### Alleged Errors in Evidence.

The following questions were objected to and the defendant excepted when the court allowed them to be answered:

"Q. How long did C. L. Riley as president and Howes and Reginald Riley managing these two concerns mine and ship coal over there from your place, your land? A. Well, I couldn't state just exactly how long they shipped there. They must have shipped coal there something like two years.

"Q. Have you ever talked to Mr. Ryley since this suit was filed, C. L. Riley? A. Yes, sir, I talked to him yesterday.

"Q. Has he ever intimated to you there was any dispute about the amount he owed? A. No, sir.

"Q. I will ask you if he didn't tell you he would pay it? A. Yes, he said he was going to pay it.

"Q. Tell what was said there by Mr. Ryley? A. Well, he told me that he owed it to us and it was as good as gold, every dollar of it and he intended to pay it, is just what he said to me, but he wanted a little time on it said he could pay it right then but he would have to shut the mines down but if we didn't make him pay it right then he could run the mines on."

Just why these conversations with the president of the defendants should not be admitted we cannot understand, and appellant does not point out any reason in brief.

All the other rulings on the evidence were in favor of the defendants.

### The Contract as to Royalties.

Among other grounds, the Happy Coal Company

sought a new trial "because there was no evidence of any contract such as alleged in the petition between the plaintiffs and the Happy Coal Company about the payment of any royalties on the coal mined, and for this reason the verdict of the jury is flagrantly against the evidence and is not supported by the evidence."

Since the Happy Coal Company had no right to mine coal under this 450 acres, except such as it had under this Rhinehart lease, it will be presumed it did so under it and the terms of it as to royalty were proven, and moreover those terms were set out in the monthly royalty statements made to the plaintiffs by the Happy Coal Company. The witnesses for plaintiffs do not often use the word lease, but usually speak of this coal as mined under the contract. which clearly means the lease.

### The Directed Verdict.

The defendants offered no evidence, and at the close of the evidence the Happy Coal Company moved the court to direct the jury to find a verdict for it, which the court overruled, and on its own motion directed a verdict for the plaintiffs for $2,230.50, and the Happy Coal Company made this a ground for a new trial, but it does not attempt to point out why this was prejudicial to it, and no reason occurs to us.

### Was Court in Session.

The principal ground relied on for reversal is:

"Because there was no term of court in existence at the time of the trial of this case, which fact was shown to the court by written objections and affidavit prior to the time of the trial of this case, but the court overruled the objections to the trial of this case on this ground and erred to the prejudice of the substantial rights of this defendant in so doing, to which ruling of the court the Happy Coal Company excepted at the time."

A disposition of this requires a consideration of the powers of the court and a statement of what was done and how it was done. For the appellees it is claimed the June term, 1934, of the Perry circuit court occupied the following days:

### June

| Mon | Tue | Wed | Thu | Fri | Sat |
|-----|-----|-----|-----|-----|-----|
| 11 | 12 | 13 | 14 | 15 | 16 |
| 18 | 19 | 20 | 21 | 22 | 23 |
| 25 | 26 | 27 | 28 | 29 | 30 |

### July

| Mon | Tue | Wed | Thu | Fri | Sat |
|-----|-----|-----|-----|-----|-----|
| 2 | 3 | 4 | 5 | 6 | 7 |
| 9 | 10 | 11 | 12 | 13 | 14 |
| 16 | 17 | 18 | 19 | 20 | 21 |

By the provision of section 965-33, Ky. Stats., this June term of this court would have begun on June 11th and come to an end on July 7th.

By the provisions of section 971-13 (as amended. Acts 1932, c. 61, sec. 5), the court had the power, if the business required it, to extend this term so long as it did not interfere with any other term in the district, and this particular term could have been extended to and including August 18, 1934.

We shall in the course of our discussion give certain order book entries affecting this case, and for convenience we shall identify them by letters and so refer to them.

### Order Book Entry A.

Perry circuit court, June term, 19th day, 2d day of July, 1934. Order extending term six days:

"It appearing that the present regular term of court will by operation of law expire on Saturday, July 7th, 1934, and that there are on the docket undisposed of and not under submission, more than ten Civil Cases, and Numerous Misdemeanor and Felony Indictments on the docket of this court, and that it is necessary to the disposal of the business in this court that the present regular term be extended. It is now ordered by the court that the present term of court be extended for a period of six juridical days, commencing on Monday, July 9, 1934."

### Order Book Entry B.

Perry circuit court, June term, 24th day, 7th day of July, 1934, Felix Brashear and Nathaniel Brashear

v. Happy Coal Company and Dakota Coal Corporation. Order:

"On motion of plaintiffs, this cause is set for trlal on Wednesday, July 11, 1934."

### Order Book Entry C.

Perry circuit court, June extended term, 27th day, 11th day of July, 1934, Felix Brashear and Nathaniel Brashear v. Happy Coal Company, etc. Order:

"This case is set for trial on the 32nd day of the present term which will be July 17, 1934."

### Order Book Entry D.

Perry circuit court, June extended term, 32d day, 17th day of July, 1934, Felix Brashear, etc., v. Happy Coal Company. Order:

"On this the 17th day of July, 1934, at motion hour and before this case was called for trial came the Happy Coal Company by counsel and tendered and offered to file an amended answer of that company, to the filing of which the plaintiffs objected and came W. A. Stanfill counsel for the Happy Coal Company and filed his affidavit in support of his motion to file the said amended answer, and the court overruled the motion to file the said answer as amended, to which ruling of the court the said Happy Coal Company objected at the time and now excepts to the ruling of the court. When the case was called for trial by the court came the Happy Coal Company and Dakota Coal Corporation by their counsel and filed their objections to the trial of this case, and set out in the said written objections the fact that there was no valid extension of this term of this court, and the fact that the court had singled out this case for trial when there were many other cases on the docket which stand for trial at this term of this court prior to the trial of this case, etc. The court having considered the said objections and being advised overruled the same to which ruling of the court the Happy Coal Company and the Dakota Coal Corporation objected and excepted. Thereupon came W. A. Stanfill and filed his affidavit with respect to the extension of this term

of this court and again objected to the trial of this action because there was no term of court at which same could be tried, and the court being advised stated in open court that the order for the extension of the regular term was made for 6 juridical days which expired on July 14th, 1934, and that during the week which said term was extended the clerk of the court changed the former order which had been entered for six days to read twelve days after the said order had been read and approved and signed in open court, and on motion of counsel for the Happy Coal Company that the said order be now corrected to conform with the facts it is now ordered by the court that the clerk of this court correct the former order entered during the regular term of this court so as that the said former order shall read that this term of this court is extended for six days instead of twelve days as it now appears and reads. The court further orders this the clerk shall enter an order now for July 11th, extending this term for a further period of 6 days from and after the expiration of the original extension thereof which expired July 14th, 1934, to which ruling of the court the Happy Coal Company objects and excepts."

#### Affidavit No. 1 of Defendant's Counsel
#### (July 17).

"The affiant says that on the first day of the regular June term of this court as is shown by the orders this court in the absence of counsel for Happy Coal Company and at a time when he was engaged in the preparations for a funeral of one Taylor Hurst who had just died, and whose funeral was to be held on that date, set this case for trial at an extended term of this court, and on the date this was set during the extended term passed the same on the announcement by this affiant that the defendant was not ready for trial until a day in the following week which was not included in the said original extended term of court."

#### Affidavit No. 2 of Defendant's Counsel
#### (July 17).

"Comes now W. A. Stanfill and objects to

the trial of this case at this time because he says there is no extended term of the Perry Circuit Court in session. He says that during the regular term of court the presiding judge of this court announced from the bench that he would extend this term of court for one week for the purpose of trying equity cases and motions and making up pleadings and that no jury trials would be had, and entered an order on the order book of this court extending the term for 6 juridical days after July 7th, 1934, and that on the last day of this term which was after the entry of the said order and after the announcement of the said judge, he set this case for trial on July 11th, 1934; that on that date the court passed this case until July 17th, and said that he would again extend his term; that the clerk of the court after the order extending the term had been read in open court and signed by the judge and during the said extended term of 6 days and on or about the 11th day of July, 1934, changed the order which had been signed during the regular term of this court to read 12 days instead of 6 days thereby attempting after the adjournment or expiration of the regular term of court to extend the term 12 days instead of 6 days."

## Order Book Entry E.

Perry circuit court, June extended term, 33rd day, 18th day of July, 1934. Order extending term, 1934. "It appearing that the present term of court will by operation of law expire on Saturday, July 14, 1934, and that there are on the docket undisposed of and not under submission, more than ten civil cases and numerous misdemeanor and felony indictments on the docket of this court, and that it is necessary to the disposal of the business in this court that the present term be extended: It is now ordered by the court that the present term of court be extended for a period of six juridical days, commencing on Monday, July 16, 1934. It appearing that this order was made on the 11th day of July, 1934, and by oversight failed to get on the order book, it is ordered that same be entered now for then."

It will be observed this order book entry E is dated July 18, 1934, but as the court had in order book entry D made on July 17, 1934, directed the clerk to make this order book entry on that date, July 17, 1934, we must treat it as if made on that date. This order book entry E is the storm center of this controversy, so we will now discuss it and the power of the court to make it when and as it was made.

The Perry circuit court is conducted by a single judge, hence the judge when sitting officially is the court.

Certain acts of a court final in their nature are called judgments. See sections 266, 267, 298 and 368 of the Civil Code of Practice. It is only from such that appeals can be prosecuted to this court. Other court actions not final in their nature are called orders. See section 622 of the Civil Code of Practice. This distinction is further recognized by section 392 of the Civil Code of Practice which requires the clerk to keep a judgment book, to cross-index the same, etc.

### Kinds of Orders.

Some orders involve the exercise of a judicial discretion, for example, one requiring a pleading to be verified or to be made more specific, striking matter from a pleading, ruling on a demurrer, etc.

Such orders in some measure affect the final result of the litigation, though they do not of themselves finally fix the rights of the parties, and may be called judicial orders.

Other orders involve the exercise of an administrative discretion only, as orders setting a cause for hearing on a particular day, fixing a time for court to convene or adjourn, calling a special term, extending a term, etc. Such orders do not in any sense determine or adjudicate any issue or issues involved in the litigation and may be called administrative orders. The order involved here falls into the latter class.

The distinction is important and must be kept in mind in reading and applying this opinion for we are dealing with the nunc pro tunc entry of an administrative order and not a judgment.

This appeal is not from order book entry E, but from the final judgment in this case, and this order book entry E is only incidentally involved because of the contribution it may have made to the rendition of the judgment from which this appeal is prosecuted.

There are two necessary elements in any valid judgment or order of a court: (a) the court's decision or determination, usually evidenced by some oral statement or pronouncement of the court, but often by a written opinion, direction or decree; and (b) the enrollment or entry by the clerk of the court's action, or the essential part of it, upon the order book or record of the court. The first element is judicial; the latter clerical. The former involves discretion; the latter obedience.

The court inherently and of necessity must control the record, hence the judicial element (a) is not subject to defeat by any ministerial act or omission of the clerk, yet the only competent evidence of the judicial action must usually be found in the record supplied by (b) the ministerial act of the clerk. The method provided by which the court is enabled to control the record in a court like this is that provided by section 378, Ky. Stats.

When an order is read and signed as there provided, it is settled except for the control of it which the court has during the whole of the term at which it was made, see Morris v. Morris, 225 Ky. 823, 10 S. W. (2d) 277, and the power of the court even after the conclusion of the term, under certain circumstances we shall hereafter discuss, to make such changes in or addition to the ministerial element as will make the record speak the truth.

### Nunc Pro Tunc Entries.

The exercise by the courts of the power to make such corrections of the record are termed nunc pro tunc entries.

The power to make such amendments is now declared in this commonwealth to be inherent in the courts. See Vanzant v. Watson, 230 Ky. 316, 19 S. W. (2d) 994. Such is now the general view, see note in 3 A. L. R. p. 1403, but there was a time when the courts felt this power came from the various statutes of jeofails, see

Hubble v. Mullanphy, Hardin (3 Ky.) 294, providing for amendments and corrections, which statutes are long and tedious and of which Judge Robertson in Anderson v. Barry, 2 J. J. Marsh. (25 Ky.) 265, 274, says there were twelve in England and that they are in force in Kentucky. See them in Morehead and Brown's Stats., vol. 2, p. 865 et seq. We shall give a bit of two of them which were most usually cited.

A. D. 1340, Edward III, ch. 6, ends thus:

"As soon as the things is perceived by challenge of the party, or in other manner, it shall be hastily amended in due form, without giving advantage to the party that challengeth the same because of such misprision."

A. D. 1664, 16 and 17 Charles II, ch. 8 ends thus:

"All such omissions, variances, defects, and all other matters of like nature, not being against the right of the matter of the suit, nor whereby the issue or trial are altered, shall be amended by the justices or other judges of the courts where such judgments are or shall be given, or whereunto the record is or shall be removed by writ of error."

That this is an inherent power of the courts is now generally recognized. See 42 C. J. p. 532, sec. 216, to sec. 225, 34 C. J. p. 71, sec. 204 et seq.; 15 C. J. p. 972, sec. 386 et seq.; 15 R. C. L. 622; 8 R. C. L. 235; notes. Ann. Cas. 1915D, 681; 3 A. L. R. 1403. Courts were exercising this power before the first statute of jeofails was written, and the object of these statutes was to induce courts to return to their former practice.

The question upon which courts are not in harmony is that of the quantum and quality of the evidence upon which such an entry may be made and concerning this there are divers views ranging from the strict adherence to the record rule which prevails in Alabama, see Perkins v. Perkins, 27 Ala. 479, to the position taken by the U. S. Supreme Court in Re Wight, Petitioner, 134 U. S. 136, 10 S. Ct. 487, 33 L. Ed. 865, where the imprisonment of Wight for two years was affirmed though the order therefor had been entered September 30, 1889, nunc pro tunc for March 12, 1889, and, after the term had ended, by the court upon its recollection alone.

Without expressing any opinion concerning what he wrote, we will say that Mr. Freeman in his work on Judgments (5th Ed.) sec. 128 et seq., commenting on the Alabama position, says:

> "The extreme position here taken is the logical result of the general rule frequently announced and more frequently violated, that a record can only be amended by some matter of record. Chief Justice Gibson, many years ago, said: 'The old notion that the record remains in the breast of the court only till the end of the term has yielded to necessity, convenience, and common sense.'"

Rhoads v. Commonwealth, 15 Pa. 272.

> "Whether" continues Freeman "The 'old notion' has yielded so far as to authorize the entry of a judgment as of some prior date, when there is no record evidence of its rendition at such date, is doubtful; but the fact of the rendition of a judgment being made evident by the record, a decided preponderance of authority authorizes the court to proceed in its subsequent investigations with the aid of oral as well as of written evidence. Were the rule otherwise, the power of courts to furnish relief, made necessary by the negligence or inadvertence of their clerks, would be so restricted in its operation as to be of little or no utility. The instances where, in the absence of the formal entry of judgment, the records show the final determination with accuracy and completeness are few in number. Our attention should not be so riveted upon the possible evil which might occasionally arise from establishing by parol the terms of some unrecorded adjudication as to make us oblivious to the more probable evil of refusing to protect the interests growing up under actual adjudications, which, though confessedly existing, have not been reduced into the most authentic form."

Coming back to our case, we must remember there is just as great a presumption in favor of the correctness of the court's action in making order book entry E as there is in favor of any other thing in this record.

"Where on the trial of a replevin suit the court verbally ordered the impounding of the subject matter of the action, its action at a subsequent term in entering a written order to the same effect nunc pro tunc will not be held erroneous in the absence of an affirmative showing to the contrary in the bill of exceptions." Devine v. Gilmore, 192 Ill. App. 625.

Appellant says this judgment is void; it has the laboring oar. It must prove from this record it is void.

"An order entered nunc pro tunc will not be disturbed if it does not affirmatively appear that the previous verbal order was not made." 42 C. J. 536.

### Let Us Look at the Record.

In order book entry E the court says that on July 11, 1934, an order was made extending the June term for a period of 6 juridical days, commencing July 16, 1934. No one disputes that. The counsel for the Happy Coal Company makes an affidavit that when he asked on July 11th for this case to be set over that the court announced he would again extend his term, and the court then set this case for the 32d day of the term, July 17th. See order book entry C. Thus the judicial element clearly appears and we might stop here, but we will go on and see how the clerk attempted to supply the ministerial element. Instead of writing out an order in proper form extending the term as the court had announced, the clerk merely turned back to order book entry A, struck out the 6 wherever it appeared, and wrote 12, so that order as thus amended, which we shall call order book entry A-2, reads thus:

### Order Book Entry A-2.

Perry circuit court, June term, 19th day, 2d day of July, 1934. Order extending term twelve days:

"It appearing that the present regular term of court will by operation of law expire on Saturday, July 7th, 1934, and that there are on the docket undisposed of and not under submission, more than ten civil cases, and numerous misdemeanor and felony indictments on the docket of this court,

and that it is necessary to the disposal of the business in this court that the present regular term be extended. It is now ordered by the court that the present term of court be extended for a period of 12 juridical days, commencing on Monday, July 9, 1934.''

When the attention of the court was called to this on July 17th, let us see what record showing the judge had that he had extended the term.

First, he had an order setting this case for trial on the 32d day of the term, and, unless this term be extended, there could be no 32d day of the term.

Second, he had this order book entry A-2 extending this term for 12 juridical days commencing July 9, 1934. We admit the clerk had no right to so change this order after the judge had signed it and while it was as done invalid as an order it was a licit memorial to authorize the court to make a proper order.

Appellant took the proper steps when it asked for this order book entry to be corrected (see order book entry D), for if it had not and the order book entry had come to us in the form that it had at the beginning of the day of July 17, 1934 (the form set out as order book entry A-2), the appellant would have been met here by the rule that the record as certified imports absolute verity, and appellant would have had no ground for contending as it now is that there was no court then and there in session.

Ordinarily, a litigant is entitled to notice and an opportunity to be heard, before there is made any amendment or correction of the record by which his rights may be affected, but the appellant needed no notice of its own motion to correct this order book entry A-2, and both parties were then present in court in person and by attorneys, the correction was vigorously proposed and resisted, the court made the correction appellant desired and then made order book entry E upon its own motion, which the court had a right to do. See 42 C. J. p. 534, sec. 221; sec. 519 Ky. Civil Code.

The court was not attempting by order book entry E to supply any judicial action, for no judicial action had been omitted; on the contrary, even appellant's

counsel states the proper judicial action was taken, but the court was having spread upon the records formally and properly the very evidence of the court's action that the clerk had put there informally and improperly.

### Let Us Look at Our Former Decisions.

We shall do this briefly, for this has already become too long. As regards judgments proposed to be entered nunc pro tunc, we have usually required that there be found upon the minute book or order book something to amend by; but in Chester v. Graves, etc., 159 Ky. 244, 166 S. W. 998, Ann. Cas. 1915D, 678 (opinion by Judge Clay), we upheld the entry nunc pro tunc after five years of two judgments, of which there was not the scratch of a pen upon the record, the only evidence thereof being the memoranda of the judge signed by him and found among the papers in the case and the affidavit of the judge and the attorney who had brought the original proceedings. See, also, Benton v. King, 199 Ky. 307, 250 S. W. 1002.

We are not dealing with the entry of a judgment but with the entry of an administrative order which everything shows was made but was irregularly, informally and improperly entered. In such matters we have not been so strict.

In Washington Life Ins. Co. v. Menefee's Ex'r, 107 Ky. 244, 53 S. W. 260, 21 Ky. Law Rep. 916, the judgment was rendered June 16, 1898. On the same day motion for new trial was overruled and appeal granted.

On August 26, 1898, appeal was filed in this court. In his brief appellee made the point that the bill of evidence had not been made a part of the record by any order of court. Thereupon the appellant on October 15, 1898, filed in the Grant circuit court the affidavit of the clerk of that court that the bill of evidence had on June 16, 1898, been signed by the judge, and ordered filed and he, the clerk, had then so indorsed the bill but through inadvertence had made no note thereof upon his minute book, nor was any order written in his order book. Upon this appellant moved for an order nunc pro tunc filing the bill. The motion was sustained and an order entered October 15, 1898, filing the

bill of evidence and making it a part of the record as of date of June 16, 1898. A supplemental record showing these things was filed in this court on October 26. 1898, and the court in its opinion approved that.

Mrs. Rogers was the official stenographer of the Scott circuit court, and, as such, on May 23, 1906, she took the evidence in the famous case of Sebree v. Thompson, 126 Ky. 223, 103 S. W. 374, 31 Ky. Law Rep. 642, 11 L. R. A. (N. S.) 723, 15 Ann. Cas. 770. The record did not show upon whose motion she had been called. On October 5, 1906, she filed her affidavit that she had been called by the defendant, Sebree, and moved the court to fix her fees and order Sebree to pay them. Sebree filed several counter affidavits, and Mrs. Rogers filed affidavits of two attorneys supporting her own. The court on October 6, 1906, entered an order as of date May 23, 1906, reciting that Mrs. Rogers had been called on motion of the defendant, Sebree, required by section 4639, Ky. Stats., and pursuant thereto her fees were fixed at $278.92, which Sebree was directed to pay, and on appeal to this court that was approved. See Sebree v. Rogers, 102 S. W. 841, 31 Ky. Law Rep. 476.

On May 29, 1908, a judgment dismissing plaintiff's petition was entered upon a jury's verdict. On that same day plaintiff filed motion for judgment non obstante, because his petition had not been traversed, also motion and grounds for new trial. On June 8, 1908, both motions were overruled and appeal to this court granted. On July 13, 1908, the court entered an order upon his recollection alone filing a traverse as of date May 29, 1908. We approved that. See Roberts v. Repass et al., 131 Ky. 10, 114 S. W. 341. To same effect is Gregory v. Meister, 141 Ky. 54, 132 S. W. 399.

William Sherrit was surety for Frank Sherrit, and at June term, 1869, the latter came into court and surrendered himself into custody, the indictment against him was dismissed, and he was discharged, but no order to that effect was made. Subsequently his bond was forfeited and judgment taken against William Sherrit, the surety on his bond, which judgment being remitted, the commonwealth appealed, and the judg-

ment was reversed. See Commonwealth v. Sherrit, 3 Ky. Op. 421. Opon return of the case, judgment was entered in October, 1870, against William Sherrit for $300 upon the bond. At October term, 1871, Frank Sherrit appeared and upon affidavits an order was entered then for June term, 1869, reciting the facts and $270 of the $300 forfeiture remitted. Again the commonwealth appealed, and the judgment was affirmed. See Com. v. Sherrit, 5 Ky. Op. 743.

Further search might disclose other instances, but we regard such as unnecessary for we have in the books an opinion written by Judge Carroll that has been cited eighteen times without a single criticism, and which we regard as conclusive of this question. We are referring to the case of Ralls v. Sharp's Adm'r, 140 Ky. 744, 131 S. W. 998, 1000, which we shall hereafter refer to simply as Ralls' Case.

Ralls' Case involved the validity of an election held to establish a graded school, and this court upheld the election.

In Ralls' Case the principal error relied on for reversal is thus stated in the opinion:

"The first error assigned is that the order directing the graded school election to be held is void because no order was entered on the order book of the Bath county court showing that the petition required by the statute had been filed."

In this case it is contended the judgment that resulted at the trial had July 17, 1934, is void because, so appellant says, no valid order was entered on the order book extending the June term for six days from and after July 16th.

Briefly, this is what the court said in the Ralls' opinion.

"The record of the county court, including the petition show: The petition was endorsed 'Filed December 11, 1905. J. T. Peters, Clerk,' and the minute book entry made on the same date 'Common Graded School, Sharpesburg District. Petition filed for graded school.' On the docket book there was made on December 11, 1905, this entry: 'Ratcliff, Nelson and Atkinson and others, petition for

graded school, Sharpesburg District. Petition filed.' There was a regular order book for the court, but no entry in reference to the graded school was made on this book; nor were the minute book or docket book containing the entries before mentioned signed by the county judge. * * * The fact that the petition was endorsed 'Filed' and that an entry of its filing was made upon the Docket Book and minute book do not meet the requirements of the statute. The docket book and minute book are not the record books in which are recorded the orders of that court. Each county court has an order book and in this book the acts and doings of the court are preserved and authenticated by the signature of the presiding judge. * * * But, notwithstanding the conclusion we have reached, as to the insufficiency of the record in failing to show that the petition was filed, can the county court of Bath county at any time after the term make a nunc pro tunc entry upon the order book of the court that will be a compliance with the statute? * * * The court may do that which except for inadventence or mistake would have been done. In making such entry the court is only correcting its own omission or mistake, or the omission or mistake of its clerk. It is not the making of a new order or direction, but the new entry of an old order or direction. * * * There is no claim that the failure to put on the order book of the court the proper order deceived or misled any person, or that it in any wise affected the result of the election. Nor can it be said that the omission was due to the fault of any person except the judge or the clerk or that their falure to enter the order was other than a mere mistake. * * * The lower court should direct the county court of Bath county to make an order upon its order book showing the filing of the petition on December 11, 1905.''

Let us now compare that case with this one.

| Ralls' Case. | This Case. |
|---|---|
| No order was made by the court or entered by the clerk. | Order was made by the court but improperly entered by the clerk. |

| | |
| --- | --- |
| No evidence what the court's order would have been. | Order actually made by the court undisputed. |
| Nothing on the order book at all. | Extension of the term informally and improperly made by the clerk on the order book. |
| Matter on which to base the nunc pro tunc entry found dehors the order book. | Matter on which nunc pro tunc entry was made found written by the clerk on the order book. |
| No order book entry by which to amend. | An improperly made order book entry by which to amend. |
| Nothing on the order book at all. | There was on the order book, order book entry C, the validity of which is unquestioned and which set this case for trial on July 17th, the 32d day of the term. |
| Nunc pro tunc order directed to be entered after the election. | Nunc pro tunc order directed to be entered before the trial. |
| This court directed that the nunc pro tunc order be made. | The court that made the record directed the nunc pro tunc order to be made. |

Clearly, this case presents a much stronger reason for the entry of a nunc pro tunc order than did the Ralls' Case. At this place we want to point out the kernel of the decision in the Ralls' Case. It is found in these 33 words, which for emphasis we shall repeat:

*"There is no claim that the failure to put on the order book of the court the proper order deceived or misled any person, or that it in any wise affected the result of the election."*

There is no showing or claim in this case that the result of this trial would have been different had this order been regularly made in the first instance.

In these 33 words which we have pointed out, Judge Carroll foreshadows what we are writing now. Whether, in case of nunc pro tunc entry of a judgment, prejudice to substantial rights will be presumed, we do not decide, but in case of nunc pro tunc entry of an administrative order substantial prejudice must be shown if reversal is sought. Ralls v. Sharp's Adm'r, 140 Ky. 744, 131 S. W. 998.

## How It All Began.

The roots of many of our present rules may be

found in the history of the past, so a bit of history may not be amiss.

In early England, as we learn from history and from Blackstone, book 3, p. 408, pleadings were oral and amendments freely made. "The judgments were entered up immediately by the clerks and officers of the court; and if any misentry was made, it was rectified by the minutes, or by the remembrance of the court." When Briton's treatise was published about 1285, Blackstone says it contained this:

> "The king therefore declares, that 'although we have granted to our justices to make record of pleas pleaded before them, yet we will not that their own record shall be a warranty for their own wrong, nor that they may rase their rolls, nor amend them, nor record them contrary to their original enrollment.' The whole of which taken together, amounts to this, that a record surreptitiously or erroneously made up, to stifle or pervert the truth, should not be a sanction for error; and that a record, originally made up according to the truth of the case, should not afterwards by any private rasure or amendment be altered to any sinister purpose."

When Edward the First returned from France in 1289, he began a wholesale prosecution of his justices for amendments they had made, even the most able and upright of them. Whether this was well intended or was mercenary, for the king needed money sorely and this was one way to get it, is disputed, Blackstone thought this mercenary, but the sums thus forfeited to the crown were enormous; for example, from Chief Justice Thomas Wayland he took upwards of 100,000 marks which is 70,000 pounds, or about $323,-000, and punished others in like manner. To enable us to understand the enormity of these amercements, we must consider the United States equivalents of some of the prices that a few years before, in 1272, had been fixed by law in the London markets, and here are a few. A fattened hen 1½ cents, a wild goose 4 cents, a Toulouse fatted goose 5 cents, a fatted lamb 12 cents, etc. The hen today would cost $1.75, the wild goose be unobtainable, a goose fattened Toulouse fashion

would fetch $6, and a choice carcass of fatted lamb would cost between $12 and $15. These things show us that Justice Wayland was mulcted for a sum whose present day equivalent in commodities would be more than $30,000,000. Hence it surpassed the $29,240,000 fine imposed on the Standard Oil Co. Standard Oil Co. v. U. S. (C. C. A.) 164 F. 376. This is not an idle illustration; these are fearful facts shown by history's printed pages and Blackstone's learned lectures. Blackstone says this severity seems to have so alarmed succeeding judges that through fear of being said to do wrong they hesitated at doing what was right. Because of the hazard they resolved not to touch a record any more, and in the reign of Richard II, 1377-1399, there are instances, Blackstone says, of their refusing to amend the most palpable errors and misentries unless by the authority of parliament.

This real sullenness, but affected timidity of the judges, resulted in the coming of that era in which it has been said it was not permissible to dot an ''i'' or cross a ''t'' in any document in court. This led to other abuses, for now clerks made mistakes and profited thereby, for the courts would not make correction except by direction of special act of parliament, which took time and was somewhat expensive. Litigants were so sorely plagued by this that parliament enacted the various statutes of jeofails.

Parliament in its efforts to relieve litigants continued to pass such statutes until it had passed 12 dealing with the subject of amendments, and in 1753 Virginia adopted all of them. By the provisions of our Constitution we adopted them, and on December 19, 1796, we added one of our own. However, sec. 134 and sec. 518 of the Civil Code of Practice has in large part if not entirely superseded all of them.

However, the courts have never recovered from the fright given them by Edward the First, 646 years ago, and they ever since have been very hesitant about amending or correcting records.

A reference to Blackstone similar to the above was made by the United States Supreme Court in Re Wight, Petitioner, 134 U. S. 136, 10 S. Ct. 487, 33 L. Ed. 865, and in Bilansky v. State, 3 Minn. 427 (Gil. 313), and the Minnesota court said in its opinion:

"I have quoted thus copiously from these commentaries, to show that the spirit of strictness claimed for the practice in respect to the amendment of records, took its rise, not in the wisdom which characterizes the body of the English common law, but from influences which have long ceased to operate, having yielded to the progress made in the science of 'jurisprudence; the sole aim of which, now, is the discovery of truth, and the promotion of justice."

We are somewhat free from fright of King Edward the First, and are resolved to pursue the path upon which we have already started, and to follow a more liberal rule in regard to the entry of administrative orders nunc pro tunc. The reason having gone, our rule regarding such orders should be and has been relaxed. To avoid having what we are saying here (regarding the nunc pro tunc entry of a purely administrative order) confused with what we have said regarding the nunc pro tunc entry of a judgment, we will add this regarding nunc pro tunc entries of the latter class.

The first reference of this court to this subject is found in Penn. v. Emerson, Sneed Ky. Dec. (2 Ky.) 292, where we said:

"Although a court ought to superintend and, upon motion, correct the acts of its ministerial officers when carrying the judgments of the court into execution; yet, when judgments are entered and the term expired, the same court has no power to reverse and set aside such judgments, as they can only be corrected by a superior court, and the only instances where they have been permitted to meddle with them, are in clerical mistakes."

In a very early case, McKey v. Moore, 4 Bibb (7 Ky.) 321, we find this:

"The great difficulty that often occurs in determining between what properly speaking are clerical misprisons and the judgment of a court, frequently produces much perplexity in deciding whether amendments are or are not allowable. But whenever the error complained of is ascertained to

consist of misprision of the clerk, and not in the judgment of the court, and there exists any thing in the record by which it can be corrected, according to a current of decisions both in this country and England, the amendment should be made."

We have not departed from that rule as regards nunc pro tunc entries of judgments. The rule in this commonwealth as to judgments seems now to be that a judgment may be entered nunc pro tunc if from some minute, memoranda, or paper in the record it can be shown the court had acted on the matter and just what the court's action was, so that nothing judicial remains to be done but to direct the clerk to supply the clerical element and to put in proper form the evidence of the court's action already informally appearing. To this rule this court has adhered, in the case of judgments, for the reason that they finally determine the rights of a litigant, but this court has, as the above-cited cases show, been less strict in regard to the nunc pro tunc entry of administrative orders, for the reason that such an order does not at all determine a litigant's rights. Hence the rule regarding the quantum and quality of evidence required to establish that such an order was made is not so rigid as in the cases of judgments or judicial orders.

In the case before us it was the Happy Coal Company itself that asked the court to correct its order, see order book entry D, and the only way in which the rights of the Happy Coal Company are affected by the nunc pro tunc order, entered by the court sua sponte, is the Happy Coal Company was forced to go to trial July 17th instead of going to trial at a later date. It does not suggest it was deprived of the evidence of a single witness or in any way embarrassed or inconvenienced, and its only complaint is the court did not permit it to file its amended answer which, as we have already shown, would not have changed the result.

The office of a nunc pro tunc entry is not to make an order now for then, but to enter now for then an order previously made, simply to put on the record proper evidence of an actual proceeding already taken and not to cure a defect caused by a failure to take such proceeding. The judicial element cannot, even

if erroneous, thus be corrected nor can its omission be thus supplied, but if the judicial element be fully established by anything in the record the court may require the clerk, by an entry made now for then, to so amend or make his record as to show properly what the court had then actually done. A court cannot thus create a judgment or supply one if such had never been made, but if the judicial element be properly established the court can require the clerical element to be thus made, so that the records will speak the truth; in other words, the court may thus record what is a fact, but it cannot by this means invent a fact concerning the judicial element or correct an error therein. See 42 C. J. p. 536.

The appellant to sustain its position relies upon several Kentucky cases which we shall discuss.

It relies upon Jett v. Farmers' Bank etc., 76 S. W. 385, 25 Ky. Law Rep. 817, where there was in question the propriety of the nunc pro tunc entry of an order making a tendered answer a part of the record. The court talked about the matter, but did not decide it, and considered the answer as if properly part of the record, so that case is of no help.

The case of Montgomery v. Viers, 130 Ky. 694, 114 S. W. 251, is cited. That was an original action in this court for a mandamus to require Judge Viers to sign a judgment left unsigned by his predecessor in office. The opinion contains a correct and learned discussion of the question before us, but all this court really decided was that the jurisdiction was in the Hardin circuit court and not in this court, and that the mandamus should be denied. So that case is of no avail to appellant.

It relies on the case of Raymond v. Smith, 1 Metc. (58 Ky.) 65, 71 Am. Dec. 458, but it was the nunc pro tunc entry of a judgment that was there involved, and there was nothing to show there had ever been a judgment rendered by the court which is in striking contrast to this case wherein there is no dispute about the court's action and the sole issue is the reformation of the clerk's improper notation of an administrative order made by the court so as to enter it properly.

In the case of Rogers v. Bigstaff's Ex'r, 176 Ky.

413, 195 S. W. 777, the record only showed what the court ought to have done, but did not show what the court did, still the nunc pro tunc entry of an order probating the will of Jones was approved. That is very different from what we have here.

The other three cases relied on, Ralls v. Sharp, 140 Ky. 744, 131 S. W. 998, Chester v. Graves, 159 Ky. 244, 166 S. W. 998, and Gregory v. Meister, 141 Ky. 54, 132 S. W. 399 we, have already cited in support of this opinion.

A reading of the old statutes of jeofails show that for over 500 years there has been an effort to get for litigants relief from trivial and immaterial matters which were not prejudicial, and by sections 134 and 756 of our Civil Code of Practice we are directed not to reverse judgments for such, and as we have found nothing in this record prejudicial to the substantial rights of the Happy Coal Company, therefore the judgment is affirmed.